1

UNITES STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------x

DIANA FALERO,

                        Plaintiff,

        -against-

DOMINO'S PIZZA, LLC and "JOHN or JANE

DOES," Fictitious names intended for the

operators of the vehicle,

                    Defendants.

Civil Action No.:  17-CV-00151

---------------------------------------x

               16 Court Street

               Brooklyn, New York

               August 25, 2017

               10:03 a.m.

        Deposition of an Expert Witness,

CHARLES ALAN KAPLAN, M.D., pursuant to Notice,

before Christine DeRosa, a Notary Public of

the State of New York.

2

1

2    A P P E A R A N C E S:

3    RUBENSTEIN & RYNECKI

4    Attorneys for Plaintiff

5          16 Court Street, Suite 1717

6          Brooklyn, New York 11241

7    BY:   FARRIS FAYYAZ, ESQ.

8

9    CHRISTOPHER KENDRIC, ESQ.

10   Attorney for Defendants

11         1225 Franklin Avenue, Suite 450

12         Garden City, New York 11530

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4           IT IS HEREBY STIPULATED AND AGREED by

5      and between the attorneys for the respective

6      parties herein, that the sealing, filing and

7      certification of the within deposition be

8      waived;

9           IT IS FURTHER STIPULATED AND AGREED that

10     all objections, except as to form, are

11     reserved to the time of trial;

12          IT IS FURTHER STIPULATED AND AGREED that

13     the transcript of this deposition may be

14     signed before any Notary Public, with the same

15     force and effect as if signed before a clerk

16     or Judge of the Court;

17          IT IS FURTHER STIPULATED AND AGREED that

18     all rights provided to all parties by the

19     F.R.C.P. cannot be deemed waived, and the

20     appropriate sections of the F.R.C.P. shall be

21     controlling with respect thereto.

22

23                    oo0oo

24

25

4

1

2   C H A R L E S   A L A N   K A P L A N,   M. D.,

3          called as a witness, having been duly

4          sworn by a Notary Public, was examined

5          and testified as follows:

6              THE COURT REPORTER:  Please state

7          your full name for the record.

8              THE WITNESS:  Charles Alan

9      Kaplan, M.D.

10             THE COURT REPORTER:  What is your

11         address?

12             THE WITNESS:  Work address is

13         100A Livingston Street, Brooklyn, New

14         York 11201.

15             MR. KENDRIC:  What is your home

16         address?

17             THE WITNESS:  75 West End Avenue,

18         Apartment P8E, New York, New York 10023.

19   EXAMINATION BY

20   MR. KENDRIC:

21         Q.    Good morning, Dr. Kaplan.

22         A.    Good morning.

23         Q.    Sir, my name is Chris Kendric.

24   It is my pleasure to meet you, sir.

25         A.    Nice to meet you.

5

1          Charles Alan Kaplan, M.D.

2       Q.      I'm here on behalf of the

3    defendant in this case, Domino's Pizza, LLC.

4    I'm going to have quite a few questions here

5    this morning.

6              If at any time you don't

7    understand my question, you don't understand

8    the way that I've phrased the question, would

9    you please let me know that?

10      A.      Okay.

11      Q.      I really don't have any interest

12   and Mr. Fayyaz has no interest in you guessing

13   at what information I'm trying to elicit from

14   you.

15             All right?

16      A.      Okay.

17      Q.      Are you affiliated with Spine &

18   Orthopedic Rehab Center, P.C.?

19      A.      Yes.

20      Q.      And they're located in Queens and

21   also in Brooklyn?

22      A.      Correct.  I believe a year or two

23   ago, they separated into two corporations, so

24   I mean, corporate-wise, Queens and Brooklyn

25   are separate.

6

1          Charles Alan Kaplan, M.D.

2        Q.      Can you tell me the difference,

3   please?

4        A.      Location?

5        Q.      No.  The different corporate

6   entities, which belongs to what?

7        A.      I think Queens is called Sports

8   Medicine & Rehabilitation.

9        Q.      P.C.?

10       A.      Not sure.  Likely.

11       Q.      Well, as an attorney, I have to

12  either be a P.C. or PLLC.  I trust you're

13  probably a P.C.?

14       A.      Yeah.  It's not my corporation.

15       Q.      But that was Queens?

16       A.      Correct.

17       Q.      Spine & Orthopedic Rehab, are

18  they also located in Englewood, New Jersey?

19       A.      The truthful answer is I'm not

20  quite sure.  There's the entity called Health

21  East.  I believe Dr. Kyriakides, because he

22  lives in New Jersey, does have a small office

23  at the New Jersey center.  I've never been

24  there.  I've never worked there.  I know it's

25  on the card.  I don't know the -- the full

7

1                    Charles Alan Kaplan, M.D.

2    status.

3          Q.      Who is Dr. Kyriakides to you?

4          A.      My employer, my boss.

5          Q.      You may have just answered my

6    next question.

7                    What is the nature of your

8    affiliation with Spine & Orthopedic Rehab

9    Center, P.C.?

10         A.      Employee.

11         Q.      Do you have any ownership

12   interest in that entity?

13         A.      No.

14         Q.      Are you affiliated with New York

15   Orthopedic Surgery & Rehabilitation?

16         A.      I'm almost going to have to

17   say -- well, I'm going to say no because I'm

18   not quite sure really of the corporate entity,

19   if Queens got changed to that or if that's

20   Dr. Scilaris.  I -- I don't know.

21         Q.      I'm going to just gently refer

22   you to the nerve conduction velocity testing

23   and EMG testing that was done in this case,

24   and this is where I see New York Orthopedic

25   Surgery & Rehabilitation (indicating).

8

1          Charles Alan Kaplan, M.D.
2     There's Dr. Kyriakides (indicating) and
3     there's you, Charles A. Kaplan (indicating).
4          A.     Again, when there was some
5     corporate structure changes like -- again,
6     even though I work there, I don't really look
7     at the paycheck so much to see the names.
8               I believe Sports Medicine was
9     always the name of Queens.  And then there
10    was corporate structural changes - because
11    I used to work both, Queens and Brooklyn,
12    part-time, part-time, and now I'm only in
13    Brooklyn - and it may have gone through a
14    change because there was talk of somebody
15    buying into the practice, not myself.  I
16    don't think it ever happened.  So I don't --
17    I don't know the full status of that, but
18    it's, I mean, our office.
19         Q.     So you may or may not be
20    affiliated with New York Orthopedic Surgery &
21    Rehabilitation?
22         A.     I guess the answer to that is
23    yes, I may or may not.  I don't -- I don't
24    get paid by this company.  I don't have a
25    corporate answer on that.  I'm sorry.

9

                    Charles Alan Kaplan, M.D.

1

2      Q.      And that's fine.  As far as I

3  know, that can be a trade name, that can be an

4  assumed name.  I don't know.  That's why I'm

5  asking the questions.

6      A.      Yeah.

7      Q.      All right.  So let me just skip

8  back for a moment, please.

9              What is the nature of your

10 affiliation, if any, with Sports Medicine &

11 Rehabilitation, P.C.?

12     A.      So I used to work in the Queens

13 office from the middle of 2008 and the

14 Brooklyn office part-time, some days a week in

15 one and some days a week in the other.  And

16 maybe about two years ago or so, I became just

17 Brooklyn full-time and really no more in

18 Queens.  And, again, this was a time there was

19 some restructuring, and so I don't have more

20 to say than that.

21     Q.      That's fine.

22             Dr. Kaplan, what do you mean by

23 "restructuring"?

24     A.      Well, again, there was -- it used

25 to be one company, I guess, with two addresses

10

1              Charles Alan Kaplan, M.D.

2    and one tax ID number.  I believe there's two

3    tax ID numbers now.  I don't have anything to

4    do with Queens now, so I don't know what's

5    going on.

6              I know last -- like, I used to

7    get health insurance and it was always -- they

8    never changed it from Queens.  And then this

9    year, I guess the health insurance company

10   said, oh, you're not really in Queens, you

11   have to do it through there, and it affected

12   my health insurance.  So I'm just now in the

13   Brooklyn office.

14        Q.    Okay.

15              Did you ever hold an ownership

16   interest in Sports Medicine & Rehabilitation,

17   P.C.?

18        A.    No.

19        Q.    Now, are you or have you been

20   affiliated with Health East Medical Group or

21   Health East Ambulatory Surgical Center?

22        A.    No.

23        Q.    Not currently, not anytime in the

24   past?

25        A.    Not anytime.

11

1          Charles Alan Kaplan, M.D.

2     Q.      Do you have an ownership interest
3 in any facility that I have not mentioned
4 which provides healthcare services?

5     A.      No.

6     Q.      Are you familiar with New York
7 Spine Institute?

8     A.      The name is familiar.  I -- the
9 name is familiar.  I'm not exactly sure.  I
10 think it's a Manhattan group.

11     Q.      Are you familiar with South Dean
12 Orthopaedics?

13     A.      I've heard the name.  Again, I
14 don't know who owns it, what the structure is.
15 I believe it's Dr. Scilaris' New Jersey
16 orthopedic practice.

17     Q.      But are you in any way affiliated
18 with South Dean Orthopaedics?

19     A.      No.

20     Q.      Sir, do you have an ownership
21 interest in any facility providing ambulatory
22 surgery services?

23     A.      No.

24     Q.      Do you have an ownership interest
25 in any diagnostic imaging facility?

12

1              Charles Alan Kaplan, M.D.

2         A.      No.

3         Q.      Do you have an ownership interest

4    in any --

5         A.      Oh, I just -- I'm sorry.

6         Q.      Go ahead, sir.

7         A.      New York Spine Institute, I'm

8    trying to think.  You know, I did work in an

9    orthopedic spine center in Long Island for

10   about 10 months in 2011.  It's so out of my

11   mind.  Again, I -- you know, I walk.  I don't

12   own a car.  Some people say, you know such and

13   such street?  I say no, but I obviously walk

14   by it every day, so I -- I mean, that may have

15   been Long Island.

16        Q.      If, in fact, you were working

17   for the Long Island office of New York Spine

18   Institute back in 2011, is that to say you

19   were also working at that same point in time

20   for New York Spine Institute, Sports Medicine

21   & Rehabilitation, P.C. and Spine & Orthopedic

22   Rehab Center, P.C.?

23        A.      I think at that time there was

24   only the Queens office, so I don't think

25   the -- it was only Sports Medicine &

13

1              Charles Alan Kaplan, M.D.

2    Rehabilitation.  And I did Fridays because my

3    work schedule at the Queens office was Friday,

4    half a day, and I needed a little bit more

5    work and they didn't have it, so I arranged it

6    so that I would just go Fridays to Long

7    Island, and that lasted about 10 months.

8         Q.     To fill the rest of your Friday?

9         A.     Yeah.

10        Q.     Okay.

11               When did the Brooklyn facility

12   open up?

13        A.     The Brooklyn facility, that I

14   know of was always there.  I mean, I've been

15   working in Brooklyn myself since 2009.  I

16   don't know when Dr. Kyriakides started it.  He

17   moved the office from Montague Street to

18   Livingston Street -- I'm tending to think it

19   was three years ago, maybe a little less.  And

20   that's, again, where I think the name change

21   got separated out.

22        Q.     Doctor, the reason I ask the

23   question is because I'm just a little bit

24   confused.

25               You told me a moment or two ago

14

1          Charles Alan Kaplan, M.D.

2    that you used to work in both the Queens

3    office and the Brooklyn office, and that

4    started from the middle of 2008?

5          A.     Correct.

6          Q.     I asked you a question about New

7    York Spine Institute, and you said you were

8    there for a short period, Fridays, only half

9    days, in 2011 for 10 months' time?

10         A.     Correct.

11         Q.     And I asked you, well, does that

12   mean that you were working at all three

13   facilities, Brooklyn, Queens and Long Island,

14   and you said --

15         A.     I think you said entities, and at

16   that time, there was only Sports Medicine.

17   There was no separate corporate entity name

18   for Brooklyn.  Physically, it was three

19   locations, but I believe it was only two

20   entities.  The one in Long Island and Sports

21   Medicine covered both locations.

22         Q.     Thank you very much.

23                Do you understand that Diana

24   Falero has brought a personal injury action

25   in connection with an accident occurring on

1          Charles Alan Kaplan, M.D.

2    May 4, 2015?

3          A.     Yes.

4          Q.     Dr. Kaplan, your initial

5    evaluation for Ms. Falero was on May 12, 2015?

6          A.     Correct.

7          Q.     So eight days after the happening

8    of the accident?

9          A.     Correct.

10         Q.     Your office note from that

11   initial evaluation on May 12, 2015 refers to

12   an "intake list."

13                Are you familiar with that term?

14         A.     Yeah.

15         Q.     What information is recorded on a

16   Spine & Orthopedic Rehab Center intake list?

17         A.     Okay.  First of all, I don't have

18   that with me.  Basic patient name, address,

19   insurance information, if there was a lawyer,

20   the lawyer's name, body parts that were

21   injured.  They fill out past medical history

22   items, medications, they sign it.

23         Q.     Anything else?

24         A.     I think that's it.  I mean...

25         Q.     How many pages is this intake?

16

1                  Charles Alan Kaplan, M.D.

2          A.      Again, I don't have it in front

3    of me.  In 2015, I think it was a different

4    one than we use now.  It could have been two

5    or three pages.

6          Q.      Dr. Kaplan, who actually fills

7    out the intake?

8          A.      The patient.

9          Q.      You mentioned they sign it.

10                 Is that the patient signs it?

11         A.      I believe so, yeah.  Yeah.

12         Q.      To what, to lend authenticity to

13   the intake?

14         A.      Yeah, I believe so.  I don't have

15   the form in front of me, so I'm going by

16   memory and it's also a form from a couple of

17   years ago.

18         Q.      All right.

19                 Did you bring your medical chart

20   with you today?

21         A.      Yes.

22         Q.      Can I take a look at that,

23   please?

24         A.      This is the chart (indicating),

25   and this is some handwritten notes I made last

1          Charles Alan Kaplan, M.D.

2    night (handing).

3               MR. KENDRIC:  Let's have this

4        marked, please.

5               (Kaplan, M.D. Exhibit A, One-page

6        handwritten notes created by Dr. Kaplan,

7        marked for identification.)

8        Q.    I'm going to hand you the one

9    page of handwritten notes now marked as

10   Kaplan, M.D. A for identification (handing).

11              Let's start, please, at the top

12   of the page on the left-hand side.  Tell me

13   what words you're writing and what those words

14   signify such that you in preparation for

15   today's deposition wrote them down.

16       A.    So the upper left is stating of

17   the areas of injury that she reported to me on

18   the initial consultation of May 12, 2015.  And

19   the first word is "dizzy."  Below that is

20   "head."  Then it says, "C/L," cervical and

21   lumbar.  Then there's "L/R," left and right,

22   "shoulder"; "L/R," left and right, "hips,

23   knee, ankle, feet."  And then it says, "lip

24   switch."

25       Q.    Then over on the right-hand side?

1              Charles Alan Kaplan, M.D.

2         A.      It says, "no ER," and below that,

3    "no prior."   That means I didn't have -- I

4    went through the notes, and I didn't have

5    emergency room or much prior records.

6         Q.      I apologize if you've already

7    said this.  Did you say that you went through

8    the chart last night and prepared this last

9    night, this sheet?

10        A.      Correct.

11        Q.      I appreciate it.

12               So now, I'm moving my way down

13   the page and to the far left-hand side?

14        A.      These are the past medical issues

15   that she, again, stated to me on the May 12,

16   2015 visit.  "HTN" stands for hypertension.

17   Then there's a slash and then an arrow up

18   "cholesterol," so increased cholesterol.

19   Below that, "fibromyalgia."  Below that,

20   "arthritis, back/knees."  Below that, "C/L,"

21   meaning cervical and lumbar issues.   Below

22   that, "hip bursitis."  And below that,

23   "bilateral sciatica."

24        Q.      Dr. Kaplan, does it make more

25   sense for us to continue down the left-hand

1                    Charles Alan Kaplan, M.D.

2    column?

3              A.      Yes.

4              Q.      Okay.

5              A.      Below that is just the medicines

6    she reported she was taking on the initial

7    examination.   They are Mobic, Robaxin,

8    Lidoderm patch, morphine, Zoloft.

9                    Below that, it says, "SSI."  That

10   means she told me she was on Social Security

11   Disability.   Then there's a question mark

12   "Sx," which I write for surgery, so I didn't

13   fill it in, but there was a question if she

14   did list surgical procedures on the initial.

15                   Below that, it says, "4/17."

16   That was the date she actually saw Dr. Faloon.

17   It's not mentioned there, but that's the --

18   I called my office and that's the date that

19   Dr. Faloon saw her, April 2017.

20             Q.      Who is Dr. Faloon?

21             A.      Spine surgeon.

22             Q.      Is he in your medical practice?

23             A.      He comes to the office once a

24   month, so he's affiliated with us.  I believe

25   he's considered his own separate corporate

1            Charles Alan Kaplan, M.D.

2    entity.

3         Q.    Do you know where his practice is

4    located?

5         A.    He does have another practice in

6    Manhattan.

7         Q.    What is his first name?

8         A.    Michael.

9         Q.    Is he an orthopedic surgeon, a

10   neurosurgeon?

11        A.    Orthopedic surgeon.

12        Q.    Do you know where his office in

13   Manhattan is located?

14        A.    Not exactly.  I'm tending to

15   think between the teens and the 40s,

16   midtown-ish.

17        Q.    Very well.

18             So now if you don't mind, let's

19   go to that middle column.

20        A.    So the middle column lists the

21   body parts that were injured, and I've listed

22   the initial ranges of motion and then arrows

23   pointing to the right, and then there's

24   another range of motion showing some increase

25   or progression of the ranges of motion.

Charles Alan Kaplan, M.D.

1

2          So on top, there's a "C" for
3  cervical, and then there's motions listed
4  there which are in my notes.  "L" is lumbar.
5  "SH" is shoulder.  The hip says "hip."
6  There's a "K" for knee.  There's an "ankle."

7          Below that, at one point I guess
8  she mentioned increased tingling in the upper
9  extremity, "(L)" for left.  And at some point,
10  I guess a symptom change, it was increased
11  left shoulder pain with decreasing motion and
12  weakness.  And then below that, a new sign was
13  a Romberg test.

14      Q.    Let me just break this down a
15  bit.  These notes that you took and specific
16  to this middle column, you said it but I want
17  to be a little more clearer on it, these are
18  the original range of motion measurements
19  taken by you in your office on May 12, 2015,
20  and later on, if there was improvement or,
21  let's say, there was a worsening of the range
22  of motion that would be noted as well?

23      A.    Pretty much, yeah.

24      Q.    "Yes"?

25      A.    Yes.

22

Charles Alan Kaplan, M.D.

1

2     Q.      In my experience, doctors go

3  through their range of motion in a particular

4  order.  I trust you do as well?

5     A.      Pretty much, yeah.

6     Q.      So let's go through it nice and

7  slowly starting with cervical and tell me --

8  I can read the numbers by myself, but maybe

9  you can tell me what those numbers refer to,

10  cervical flexion, cervical extension, right

11  lateral bending, you have to tell me, please.

12     A.      Sure.  So the first one says

13  10/10, so that's flexion and extension.  She

14  had 10 degrees flexion, 10 degrees extension.

15  There's a little arrow to the right.  At some

16  point that improved to -- I wrote 20.  It was

17  probably 20/20, but I only wrote one "20."

18           Below that is 40/40.  That

19  represents rotation, turning left and right.

20  And the arrow, at one point it went down to

21  30.  Then it went up to 50.  Then it went up

22  to 60.

23           Below that is a 10.  That's left

24  and right side bending was 10, went up to 20.

25           The "L" for lumbar, she had a 30

23

1          Charles Alan Kaplan, M.D.
2    forward flexion and a 10 extension.  At some
3    point that went up to 40 for flexion and then
4    45.
5              The 10/10 there represents left
6    and right side bending, and it looks like I
7    put the arrow going to 20 slash and it looks
8    like another 20.  It's very small.
9              Then we have the shoulder and --
10        Q.      External rotation?
11        A.      No.  The first one is going to
12   be --
13        Q.      (Indicating.)
14        A.      No.  That says, Scilaris, 165.
15   That's what the orthopedist measured it at
16   some point when he saw her.
17        Q.      Thank you.
18        A.      So the shoulder there is forward
19   flexion, abduction.  Again, these are brief
20   notes.  I mean, if I went to my notes and you
21   said, oh, I see shoulder flexion was 110 and
22   abduction was 120, and I just said it's
23   probably for both, these are brief notes, so
24   I'm reading it to you, but that's forward
25   flexion and abduction.

24

1          Charles Alan Kaplan, M.D.

2          And I guess at one point, I have

3   R greater than the left.  It could mean that

4   she was complaining more of the right.  I

5   don't remember.  But eventually, it went up to

6   140 and then up to 150.

7          The 50/50 represents internal and

8   external rotation, which eventually went to 60

9   and then -- again, I would have to look here

10  because this is just a brief note.  It looks

11  like it may have went up to 70.  There was

12  impingement signs.

13          Then the hip, she started with

14  flexion and internal rotation there, 90 for

15  flexion, 10 for internal rotation, and went up

16  to 100 degrees.

17          The knee, again, it says zero to

18  110, in parentheses, left greater than right.

19  It probably means she was complaining more

20  left greater than right, and then eventually

21  those went up to 115.

22          The ankle, there's 15/30,

23  representing dorsiflexion and plantar flexion,

24  and those went up to 20 and 35.  Inversion is

25  10, eversion is 5, and it looks like those

25

                    Charles Alan Kaplan, M.D.

1          didn't change.

2                Q.     So in a sense, you're quickly

3          charting her progress with respect to at least

4          range of motion while under your care?

5                A.     Correct.

6                Q.     So now let's please turn our

7          attention to the right-hand column.

8                A.     Okay.

9                       You want me to read it?

10               Q.     Yes, please.

11               A.     So I wrote there, "no meds."

12         I didn't prescribe her medication because she

13         came in already on several pain-related

14         medications.  So I wrote "PT" for physical

15         therapy, that she was on PT.

16                      And then I listed medical devices

17         that she obtained, a cane, TENS, transcutaneous

18         electrical nerve stimulator, LSO, a lumbar

19         sacral orthosis, that's a back brace,

20         C-traction, that's a home cervical traction,

21         and knee braces.

22                      Then below that is a brief

23         synopsis of MRIs and diagnostic testing that

24         were ordered, "C/L MRI," cervical and lumbar

26

Charles Alan Kaplan, M.D.

1   Charles Alan Kaplan, M.D.

2   MRI.  I put two little pluses up there

3   indicating there were findings.  I have in

4   parentheses, "prior negative."

5           Then below that is actually a

6   procedure.  It says, "TP," trigger point,

7   "L/S," lumbosacral.  Then it went into more

8   notes into the -- then she had a right

9   shoulder injection.  Then she had a left

10  shoulder injection, and then I wrote "times

11  two," because she must have had it again.

12  Then I wrote that she had cervical and lumbar

13  trigger injections again.

14          "C/L EMG," electromyography,

15  cervical and lumbar, and I wrote two

16  positives, so there were positive findings.

17          Right shoulder, again, back to

18  MRI, positive; left shoulder -- underlined

19  left shoulder, positive; left and right hip,

20  a little positive sign below that; right knee,

21  I have below that, "Fx" for fracture.  Left

22  foot, it looks like post-op changes/OA.

23          Below that, the doctors I

24  referred her to --

25      Q.    Wait.  Osteoarthritis?

27

1                    Charles Alan Kaplan, M.D.

2        A.        Osteoarthritis, I'm sorry.

3                  First is listed Dr. Moise, pain

4    management.  Below that is Dr. Scilaris.

5    There's a little parentheses there, and at

6    first I wrote, "she did not want," that was

7    her original course of plan, but that

8    subsequently changed.

9                  Below that, I had Dr. Perse

10   (phonetic), who was a foot doctor.  At one

11   point, her foot was really bothering her.  She

12   never went.  It started to ease up.  We agreed

13   she didn't have to see him.  Then it says

14   Dr. Faloon, and it says, "no Sx," meaning no

15   surgery.  She had one visit with him.

16       Q.        No surgery --

17       A.        For the spine.

18       Q.        No surgery performed or no

19   surgery contemplated?

20       A.        No surgery contemplated at that

21   time, which was April of 2017, and there's no

22   note available on that.

23       Q.        What do you mean "there's no note

24   available on that"?

25       A.        I don't have it.  It's not in

28

1              Charles Alan Kaplan, M.D.

2    the office.  It could have been anything he

3    dictates or whatever he does, it didn't come

4    out properly.  Right now, it's not available.

5         Q.      Okay.  So let's finish up and

6    then I'll --

7         A.      Okay.  Below that towards the

8    left, it says, "Lempert."  That's a

9    neurologist that I more recently recommended

10   she see for balance potential issues.

11              Below that lists some procedures,

12   "L - epidurals," lumbar epidurals, "/MBB,"

13   medial branch block."  I wrote "times two."

14   Left knee surgery, and then the date,

15   11/29/16.  Right knee surgery, the date,

16   March 16, 2017.  And then below that, "C -

17   epidural," meaning cervical epidural, "/MBB,"

18   meaning medial branch block.

19        Q.      Okay.  Thank you very much.  That

20   was great.

21              So we touched upon the fact that

22   the patient intake is not here in front of

23   you.  Where is it if it's not here?

24        A.      Probably in the computer in the

25   office.

29

1              Charles Alan Kaplan, M.D.

2        Q.      At Spine & Orthopedic Rehab

3    Center, does your staff scan in handwritten

4    and signed intakes given to you by the

5    patient?

6        A.      I'm going to say generally, yes.

7        Q.      So when we say it's in the chart,

8    it's in the chart as a PDF with, presumably,

9    Ms. Falero's signature on it?

10       A.      Presumably.  I -- I -- I didn't

11   look in the computer for this myself, you

12   know.  This pack was handed to me last night

13   when I left the office because that's when

14   I found out I was coming.

15       Q.      Now, I understand that you

16   created the one-page document, Kaplan M.D.

17   Exhibit A for identification.

18              These other pages that you

19   brought with you, is this Ms. Falero's

20   original chart, are these photocopies of the

21   chart?

22       A.      No.  There's a button that says

23   "print chart," and it gets printed.  I mean,

24   it's not a photocopy.

25       Q.      So is that to say that Spine &

30

1          Charles Alan Kaplan, M.D.
2     Orthopedic Rehab does not maintain a paper
3     chart on the individual patient?
4          A.     Yeah.  We went paperless years
5     ago.  Actually, very little was -- I'm not
6     even sure if it was a paper chart when I was
7     there in 2009.  Yeah, I think many doctors'
8     offices don't have paper.
9          Q.     So, Dr. Kaplan, would it be fair
10    and accurate to say that if I called for the
11    production of Ms. Falero's quote, original
12    chart, as maintained by Spine & Orthopedic
13    Rehab Center, you would hand me these pages
14    because these pages that you brought with you
15    are, in fact, recreatable at the press of a
16    button, this is her original chart?
17         A.     Correct.
18         Q.     May I ask you, please, in this
19    case, do you or does your staff at Spine &
20    Orthopedic Rehab Center maintain MRI images
21    either on film, which is old school, or on a
22    CD-ROM or in the computer itself?
23         A.     The answer is generally, no.
24    There are patients who sometimes they get MRIs
25    from other people and they're waiting to see

31

1               Charles Alan Kaplan, M.D.

2       the spine surgeon and we'll keep -- they'll

3       hand them to the front desk.  We keep them in

4       a little box.  They stay there two, three

5       weeks until their appointment comes up, and

6       then they go back to the patient.  So we're

7       not really maintaining disks or films.

8            Q.     Because keeping all of those

9       boxes can get --

10           A.     Pretty much.

11           Q.     Okay.  And that's why you've gone

12      paperless also?

13           A.     Correct.

14           Q.     So tell me, if you know, please,

15      does Spine & Orthopedic Rehab Center maintain

16      any MRI images on this particular patient,

17      Diana Falero?  I know you have reports.  I'm

18      talking about images right now.

19           A.     I'm going to say no.

20           Q.     But to be sure, you've received

21      MRI reports from persons who you trust as

22      reputable qualified radiologists, correct?

23           A.     Correct.

24           Q.     All right.  Feel free to look at

25      anything you want to.

32

1                    Charles Alan Kaplan, M.D.

2                    Okay?

3          A.        Okay.

4          Q.        Can you tell us, please, what

5     function or purpose does the intake serve for

6     you, the physician, or for Spine & Orthopedic

7     Rehab Center?

8          A.        The intake form that I don't have

9     here?

10         Q.        Yes.  Correct.

11         A.        For me, it's --

12         Q.        And by the way, I'm not critical

13    of the fact that you don't have it.  We'll get

14    it eventually.  It is what it is.

15         A.        Okay.  98 percent, 99 percent of

16    the people fill out a form.  You do have some

17    people who don't fill it out.  If you pulled

18    it up today, that you had it, and there was a

19    blank under the name, what can I say?

20                   But for me, I'm interested in

21    the medical information.  You know, I'm not

22    interested in, you know, their private

23    insurance company.  We never really bill

24    anybody.  You know, if they put GHI, Blue

25    Cross, I'm not involved with the business of

1                    Charles Alan Kaplan, M.D.

2    the office.  I don't take their addresses and

3    things like that.

4                    So I'm interested in what boxes

5    they are checking off, head, neck, shoulder,

6    this and that, and they write relevant past

7    medical-surgical history and things like that.

8    If they are right-handed, left-handed, I

9    believe are on the form.  So the medical

10   information.

11        Q.    What functional purpose does that

12   serve for you, the physician, or for the

13   practice, Spine & Orthopedic Rehab Center?

14        A.    So one, in terms of general

15   medical issues, diabetes, high blood pressure,

16   things like that, you get a general sense of

17   the patient's health, would they even be able

18   to do physical therapy, would they even be

19   able to do surgical procedures down the road.

20   So you get a function -- information about

21   their general health, is one thing.

22                    The second thing is prior history

23   of problems in associated areas that they are

24   coming in that day to tell me they have.

25   Again, past surgical history, things might be

34

1          Charles Alan Kaplan, M.D.

2    related to body parts they're coming in to

3    complain about, or unrelated in that they

4    might have said they had a procedure but they

5    had a reaction to anesthesia.  Again, if they

6    went to see the surgeon down the road, they

7    would also get that information, but it would

8    be available here.

9               Medications, again, things that

10   are, let's say, unrelated medical problems

11   that would preclude me from writing a medicine

12   that I wanted to write for a painful condition

13   or if they were on pain medications already.

14   Allergies, you know, again, if they have

15   allergies to medicines, what I could or could

16   not write for them.

17               And review of systems, getting

18   information about other body parts, smoking,

19   drinking, work history, things like that.

20        Q.    It serves to give you a clear

21   picture of this patient's state of health and

22   what you may or may not be able to do for him

23   or her?

24        A.    Correct.  You know, I'm not going

25   to say, you know, it's the most clear picture

35

1                Charles Alan Kaplan, M.D.

2    because some people don't know how to explain

3    or even in the short boxes, if we're talking

4    about the boxes you write down, you know,

5    everything, someone writes "diabetes," it

6    could be somebody who watches their diet or

7    takes a simple medicine or the patient may, in

8    fact, have been hospitalized, so it's a short

9    box they have there.

10        Q.    Does it permit you, the

11   physician, to inquire further if you see

12   something on the intake that catches your eye

13   and may be relevant?

14        A.    It can, yes.

15        Q.    Only if you know, Dr. Kaplan, how

16   was it that this particular patient, Diana

17   Falero, came to see you?  How was it that she

18   came to seek treatment from Spine & Orthopedic

19   Rehab Center?

20        A.    The truthful answer is, I don't

21   know exactly how she came to the office.  She

22   came to see me because I was working the day

23   she made the appointment.  Obviously, again,

24   before last night, I don't recall knowing that

25   her attorneys are Rubenstein & Rynecki.  I

36

                    Charles Alan Kaplan, M.D.

1                    Charles Alan Kaplan, M.D.

2   just either knew for the first time yesterday

3   or re-remembered it was Rubenstein & Rynecki

4   yesterday.  Again, it could have been that the

5   patient came from the attorneys or they could

6   have come to us first and happened to have

7   Rubenstein & Rynecki.  I don't know.

8           Q.    Would that information be listed

9   on the intake, like a referring source,

10  whether the patient came to you from a

11  litigation attorney versus from, let's say,

12  her PCP, her primary care physician?

13          A.    There is an area.  Again, I don't

14  know what she filled out, but it doesn't

15  really say -- I don't believe it says

16  "referral."  It just says, who is your

17  attorney, meaning -- again, people do know us.

18  I mean, she could have a friend who said, see

19  Kaplan, see Rubenstein.  I don't know.  So I

20  don't think it says "referral" there, just a

21  list.

22          Q.    Do you know if Ms. Falero had

23  been seen or treated for the injuries she

24  claims to have received in this May 4, 2015

25  accident by any physician, sir, after visiting

37

1                    Charles Alan Kaplan, M.D.

2      the emergency department at Kings County

3      Hospital but before coming to see you on

4      May 12th?

5           A.     I have no documentation or

6      comment in my notes about that.

7           Q.     Which means what to you, if

8      anything?

9           A.     On some level, it could be --

10     let's say, she didn't see somebody, okay.  I

11     don't have it documented plus or minus either

12     way, so I guess you can say there's some

13     information that's missing there which could

14     actually be information or maybe there's

15     nothing there.  I don't know.

16          Q.     Let me make it a little more

17     concrete.

18                 In your medical practice, do you

19     typically record healthcare providers that the

20     patient has been seen or treated by prior to

21     arriving in your office for the initial

22     evaluation?

23          A.     I would say that the answer is

24     typically, yes.  I will say that it's possible

25     either it didn't come up, I didn't record it,

1               Charles Alan Kaplan, M.D.

2    the patient, perhaps, didn't volunteer it.  It

3    can happen because, you know, there's -- it's

4    possible it could not happen.

5          Q.     Well, these different office

6    notes that you have before you, do you dictate

7    your office notes?

8          A.     Yeah.

9          Q.     Is the audio recording saved for

10   some period of time or does it --

11         A.     No.  No.  It's not that kind of

12   dictation.  It's a drag-in dictation.  It goes

13   right into my computer.  There's no service.

14               MR. KENDRIC:  Off the record.

15               (Discussion off the record.)

16         Q.     So here we know that Ms. Falero

17   provided a past medical history?

18         A.     Correct.

19         Q.     Similar type of question:  Can

20   you tell us why your office takes a past

21   medical history from the patient at the time

22   of that initial evaluation?

23         A.     It's -- number one, it's standard

24   good medical practice.  Two, sometimes people

25   don't write everything or certain things on

1                    Charles Alan Kaplan, M.D.

2      the intake form, so sometimes you get more.

3           Q.     Who is taking that past medical

4      history?

5           A.     That is me.

6           Q.     That's you, the physician?

7           A.     Yeah.

8           Q.     That's not a nurse who --

9           A.     No.  We don't have that.

10          Q.     All right.

11                 So if I understand the sequence

12     correctly, the patient fills out the intake,

13     you, the physician, take a look at the intake

14     at the time of the initial evaluation because

15     it may lead you to ask questions or assist you

16     in charting a proper course of treatment for

17     this particular patient, correct?

18          A.     Correct.

19          Q.     But then the past medical history

20     is you verbally asking questions to the

21     patient?

22          A.     Correct.

23          Q.     Is this something that she's

24     filling out on the intake, the past medical

25     history?

Charles Alan Kaplan, M.D.

1

2     A.     I believe there was a space for

3  it, yes.

4     Q.     Let me, please, have you

5  concentrate on the different medications that

6  were recorded on Ms. Falero's intake.

7            All right?

8     A.     Yes.

9     Q.     At the time of your May 12, 2015

10  initial evaluation, she was already taking

11  Mobic, correct?

12     A.     Correct.

13     Q.     Prescribed for her by whom,

14  please?

15     A.     My understanding it's a preceding

16  doctor before this accident.  I don't have a

17  name or more detail.

18     Q.     And Mobic is --

19     A.     Anti-inflammatory.

20     Q.     It's used to treat what medical

21  conditions, generally?

22     A.     Many.  Many.  You can treat

23  different aches and pains, pain conditions.

24  You can treat, you know, menstrual cramps with

25  it.  You can treat headaches with it.  It's

1          Charles Alan Kaplan, M.D.

2     a pain reliever.  It's an anti-inflammatory.

3          Q.     Dr. Kaplan, what medical

4     condition or conditions was it used for in

5     Ms. Falero's individual case?

6          A.     I can't say with certainty what

7     her specific use was or when it was instituted.

8     I'm going to say most likely, not her blood

9     pressure or her cholesterol, but any of the

10    others, it could be prescribed for.

11         Q.     Okay.  And we'll get to those.

12               Do you know for how long prior to

13    the accident of May 4, 2015 Ms. Falero was

14    taking Mobic?

15         A.     I do not.

16         Q.     Sir, prior to her coming to see

17    you, did Ms. Falero suffer from ostearthritis

18    or rheumatoid arthritis or both or neither?

19         A.     I have in my note what she told

20    me she had, which is arthritis.  There's no

21    documentation that she told me she had

22    rheumatoid arthritis, and again, it is what

23    she told me she had.

24         Q.     She was not specific with you in

25    terms of whether it was ostearthritis or

42

1            Charles Alan Kaplan, M.D.

2    rheumatoid arthritis?

3              MR. FAYYAZ:  As opposed to just

4       plain arthritis?

5              MR. KENDRIC:  Off the record.

6              (Discussion off the record.)

7       A.    The answer is this -- well, she

8    told me it's arthritis.  If -- I'm going to

9    say this:  I don't have it documented that

10   patient states she does not have rheumatoid

11   arthritis.  I'm going to say if that comment

12   came up, either her telling me or me asking,

13   I would have wrote "rheumatoid."  So I'm going

14   to tend to say it's just general arthritis.

15      Q.    Is general arthritis synonymous

16   with ostearthritis?

17      A.    Well, again, you're talking about

18   lay population and medical population.  But it

19   would be perfectly reasonable for someone who

20   has ostearthritis to say, I have arthritis,

21   and have the conversation continue, either

22   with the doctor, even with a friend, and not

23   have it come up the other way.

24      Q.    Okay.

25              What dosage of Mobic was

43

1              Charles Alan Kaplan, M.D.

2    Ms. Falero taking?

3         A.    I don't have it recorded.   It

4    comes in two different doses.

5         Q.    She was also taking Robaxin,

6    correct?

7         A.    Correct.

8         Q.    Prescribed for her by whom,

9    please?

10        A.    I don't know for -- by whom.

11        Q.    Robaxin is a muscle relaxant,

12   correct?

13        A.    Correct.

14        Q.    Used to treat what conditions,

15   generally?

16        A.    Neck and back pain, spasm.

17        Q.    What condition or conditions was

18   it used for in Ms. Falero's specific case?

19        A.    Again, I don't have it

20   documented.  I would say, you know, not her

21   blood pressure or her cholesterol, and it

22   could have been used for some of the other

23   ones.

24        Q.    What dosage of Robaxin was she

25   taking?

44

                    Charles Alan Kaplan, M.D.

1

2          A.     I don't have it recorded.

3          Q.     Dr. Kaplan, for how long prior to

4    the accident of May 4, 2015 had Ms. Falero

5    been taking Robaxin?

6          A.     I don't have it recorded.

7          Q.     Sir, I'm not in any sense trying

8    to be argumentative with you.  When you say

9    "I don't have it recorded," is that to say you

10   don't know?

11         A.     Correct.

12         Q.     All right.

13                Ms. Falero at the time of your

14   May 12, 2015 initial evaluation was already

15   wearing Lidoderm patches?

16         A.     She was using them.  I don't know

17   if she was wearing them that day.

18         Q.     That's fair.

19                Can you tell me, please, what are

20   Lidoderm patches and what medical conditions,

21   generally, are they used to treat?

22         A.     So Lidoderm is lidocaine, which

23   is an anesthetic.  It's in a patch form.  So

24   it's a numbing medicine like when you go to

25   the dentist, they give you lidocaine.  This is

45

1               Charles Alan Kaplan, M.D.

2    in patch form, and you can use it, again, for

3    many different painful conditions.

4               And you can, generally, put it

5    anywhere on the body that it will stick,

6    meaning it will generally work better on a

7    bigger body part like a back, a neck, a

8    shoulder.  It's hard to get them on the

9    fingers, that's why you can get lidocaine in a

10   gel form.

11        Q.    Who prescribed these Lidoderm

12   patches for Ms. Falero?

13        A.    I don't know.

14        Q.    Doctor, in Ms. Falero's

15   individual case, for what medical condition or

16   conditions had she been prescribed Lidoderm

17   patches?

18        A.    Say that again.

19        Q.    I said, in Ms. Falero's

20   individual case --

21        A.    Oh, okay.  Again, I'm going to

22   say not -- most likely, not her blood pressure

23   or cholesterol, and it could be any of the

24   other conditions I have listed there.

25        Q.    Can you tell me, please, for how

46

1          Charles Alan Kaplan, M.D.
2    long prior to the accident of May 4, 2015 had
3    Ms. Falero been wearing Lidoderm patches?
4          A.     I don't know.
5               MR. FAYYAZ:  Off the record.
6               (Discussion off the record.)
7          Q.     We've had a brief off-the-record
8    conversation.  Dr. Kaplan, I just want to make
9    sure that I'm being clear on the record.
10               These different medications that
11   we've gone through so far in the questioning,
12   is it, sir, your understanding that Ms. Falero
13   was taking each of these prior to the May 4,
14   2015 accident?
15         A.     That is -- that's my
16   understanding of her case and my understanding
17   of how my notes read as I look at them today
18   and how I do my notes in general.
19         Q.     All right.  I'm not trying to
20   confuse you.  I'm actually trying to clarify
21   the issue because Mr. Fayyaz had a question.
22         A.     Right.
23               MR. FAYYAZ:  Now, is it your
24          understanding that these medications
25          were not prescribed some time during

47

1                Charles Alan Kaplan, M.D.

2          May 4, 2015 and immediately prior to

3          your initial evaluation on May 12, 2015?

4                THE WITNESS:  That's my

5          understanding.  Is it possible that

6          either from the intake, my understanding

7          of what the patient conveyed to me, and

8          people sometimes -- again, she's sitting

9          there in pain, they may not say the

10          right thing.

11                I mean, if you can prove to me

12          otherwise, I would accept legitimate

13          proof that Mobic came from Kings County.

14          But the way I do my notes, these

15          medications are things she had before

16          May 4th.

17     BY MR. KENDRICK:

18          Q.    So continuing on, please.

19                Ms. Falero was already taking

20     60 milligrams of morphine, three times a day,

21     prior to the happening of the May 4, 2015

22     accident?

23          A.    That's my understanding, yes.

24          Q.    And, Doctor, morphine is a

25     narcotic?

1             Charles Alan Kaplan, M.D.

2        A.      Correct.

3        Q.      It's used to treat pain, correct?

4        A.      Correct.

5        Q.      For how long prior to the

6   accident of May 4, 2015 had she been taking

7   60 milligrams of morphine, three times each

8   day?

9        A.      I don't know.

10        Q.      Sir, for how long had she been

11   taking morphine three times a day?

12        A.      Didn't you just say that?

13        Q.      First I asked you for how long

14   she had been taking 60 milligrams, three times

15   a day.  Now I'm asking you a slightly

16   different revised question.

17        A.      Can you say that again then?

18        Q.      For how long had she been taking

19   morphine three times a day?

20        A.      I don't know.

21        Q.      For how long before the May 4,

22   2015 accident had she been taking morphine?

23        A.      I don't know.

24        Q.      And the morphine was prescribed

25   for her by whom?

49

1               Charles Alan Kaplan, M.D.

2        A.     I don't know.

3        Q.     For what specific medical

4   condition or conditions was she prescribed

5   morphine?

6        A.     I don't know.

7        Q.     I apologize for the

8   repetitive-type nature of these questions, but

9   we are dealing with a lot of different

10  medications.

11       A.     Got you.

12       Q.     All right.  Among others -- and

13  we're not going to go through every single one

14  because I know she's taking cholesterol

15  medication and such.

16              Among other medications,

17  Ms. Falero was also taking Zoloft prior to the

18  time of this May 4, 2015 accident?

19       A.     Correct.

20       Q.     And Zoloft is classified as an

21  antidepressant, correct?

22       A.     Correct.

23       Q.     What different conditions,

24  generally, is Zoloft used to treat?

25       A.     Depression, you know, again,

1          Charles Alan Kaplan, M.D.

2   there's an association with fibromyalgia.

3   People -- there's an association with

4   depression and fibromyalgia.  Maybe some people

5   don't get a full diagnosis of depression, but

6   they will get Zoloft.  But it can even be used

7   to treat some headaches because there are some

8   neurologists who say people who get chronic

9   headaches are depressed, even though they have

10  not been with a psychiatrist.  So that's

11  really it.  Depression is the main one.

12       Q.     Who prescribed Zoloft for

13  Ms. Falero?

14       A.     On this day of May 12th, I'm

15  going to answer, I don't know.

16            I believe -- can I say something?

17  I believe in one of my other notes,

18  subsequently, I guess it came up and -- at

19  this moment, I'm going to say I don't know,

20  but she did tell me she did go to a

21  psychiatrist for a short time and then stopped

22  going, so I don't know who was continuing her

23  medicine.

24       Q.     Do you know, Dr. Kaplan, for what

25  specific medical condition or conditions was

1                  Charles Alan Kaplan, M.D.

2      Ms. Falero prescribed the Zoloft?

3              A.      I don't know.

4              Q.      Do you know, sir, for how long

5      prior to the accident of May 4, 2015 she had

6      been taking Zoloft?

7              A.      I don't know.

8              Q.      Now, I understand you have given

9      Ms. Falero certain injections in your office,

10     true?

11             A.      Correct.

12             Q.      But you've never prescribed any

13     oral medications for her to take herself; is

14     that also correct?

15             A.      Correct.

16             Q.      Can you tell us why not, sir?

17     Was there a reason why you refrained from

18     prescribing oral medication?

19             A.      Yes.  I listed at least on

20     several notes including this one, I will not

21     be prescribing any medications as she's

22     already taking several.  She's on an

23     anti-inflammatory.  She's on a muscle

24     relaxant.  She's on a patch, and she's on a

25     high dose of a narcotic.  And I was, you

1          Charles Alan Kaplan, M.D.

2    know -- she's on these medicines.  I'm not

3    going to add, at least on the first day.

4    Let's get her into therapy and see how she

5    performs.  And later on, I was not going to be

6    changing her medicines.

7          Q.    Have you at any time subsequent

8    to your initial evaluation prescribed oral

9    medication for Ms. Falero?

10         A.    I believe not.

11              MR. KENDRIC:  I'd like to mark

12         this as Kaplan, M.D. Exhibit B for

13         identification, which states "Follow-up

14         Report" with the date August 2, 2017,

15         consisting of two pages.

16              (Kaplan, M.D. Exhibit B, Two-page

17         document entitled Follow-up Report dated

18         August 2, 2017, marked for

19         identification.)

20              MR. KENDRICK:  Let the record

21         please reflect that coming into this

22         morning's examination of Dr. Kaplan, the

23         most recent office note that had been

24         provided to me by plaintiff's counsel

25         accompanied their notice of exchange of

53

1          Charles Alan Kaplan, M.D.

2          expert information dated July 21, 2017,

3          plaintiff's counsel provided me with a

4          Spine & Orthopedic follow-up report

5          dated June 14, 2017.

6               Now, I'm not saying this in any

7          sense to be critical.  It's just this

8          is the very first time I'm seeing the

9          follow-up report dated August 2, 2017,

10         and this came to me from Dr. Kaplan's

11         printout of Ms. Falero's original

12         medical chart.  So we're going to

13         proceed.  I just may need to take a

14         little break to thoroughly review this

15         August 2, 2017 report at some point

16         before we close out the record.

17    BY MR. KENDRICK:

18         Q.    Dr. Kaplan, was August 2, 2017

19    your most recent, most current evaluation of

20    Ms. Falero?

21         A.    Yes.

22         Q.    Before August 2, 2017, was your

23    most recent evaluation on June 14th of 2017?

24         A.    Yes.

25         Q.    Can you tell me, please, before

54

1              Charles Alan Kaplan, M.D.

2    June 14th, when had you last professionally

3    seen or treated Ms. Falero?

4         A.    I saw her May 22nd for a shoulder

5    bursa injection.  And before that was May 3rd

6    for a follow-up.

7         Q.    May 22nd and May 3rd of this

8    year, 2017?

9         A.    Correct.

10         Q.    At the time of her initial visit

11   with you back in May of 2015, Ms. Falero

12   presented to you with certain complaints; is

13   that correct?

14         A.    Correct.

15         Q.    She stated to you that in the

16   May 2015 accident, she had injured her head?

17         A.    Correct.

18         Q.    She stated that she had injured

19   her neck?

20         A.    Correct.

21         Q.    Her lower back?

22         A.    Correct.

23         Q.    Both of her shoulders, left and

24   right?

25         A.    Correct.

55

1              Charles Alan Kaplan, M.D.

2       Q.      Both of her hips, left and right?

3       A.      Correct.

4       Q.      She stated to you in the May 4,

5  2015 accident, she had injured both of her

6  knees, left and right?

7       A.      Correct.

8       Q.      Both of her ankles?

9       A.      Correct.

10      Q.      And both of her feet?

11      A.      Correct.

12      Q.      Now, Dr. Kaplan, this follow-up

13  report dated August 2, 2017, this is your most

14  recent, most current evaluation of Ms. Falero,

15  correct?

16      A.      Correct.

17      Q.      And this follow-up report does

18  not contain any expert medical opinion by you

19  regarding causation; is that correct?

20      A.      Let me just hear the question one

21  more time.

22      Q.      Yes, of course.

23              This follow-up report dated

24  August 2nd of 2017, we've established, I

25  believe, is your most recent, most current

1              Charles Alan Kaplan, M.D.

2    evaluation of Diana Falero?

3         A.    Yes.

4         Q.    And this same follow-up report,

5    August 2, 2017, does not contain any expert

6    medical opinion by you regarding causation; is

7    that correct?

8         A.    Correct.

9         Q.    It contains Ms. Falero's report

10   to you about what body parts she feels were

11   injured in the accident, no doubt about that,

12   correct?

13        A.    Correct.

14        Q.    In your medical practice, are

15   you from time to time called upon to prepare

16   what is sometimes referred to as a narrative

17   medical report?

18        A.    Correct.

19        Q.    And in your medical practice,

20   Dr. Kaplan, does your narrative medical report

21   typically contain your expert medical opinion

22   regarding causation?

23        A.    Yes.

24        Q.    What is meant when you give your

25   opinion that a particular injury is causally

1               Charles Alan Kaplan, M.D.

2    related to an accident?  What is meant by that

3    legal/medical term?

4         A.      That the event such as what she

5    reported here caused, literally caused, her

6    level of symptoms and her level of physical

7    injury that can be examined.

8         Q.      Say that again.  I'm sorry.

9         A.      That the event causes the injury

10   including the level of complaints she has

11   about pain as well as injury that can be

12   examined, documented.

13        Q.      When you say an injury that can

14   be examined or documented, are you referring

15   to an injury that can be objectively verified?

16        A.      Correct.

17        Q.      So we're on the same page, that's

18   what you're talking about, correct?

19        A.      Correct.

20        Q.      Okay.

21               Now, did Ms. Falero's personal

22   injury lawyers in this case, Rubenstein &

23   Rynecki, ask you to give your opinion with

24   respect to causation in connection with your

25   most recent, most current evaluations of her?

Charles Alan Kaplan, M.D.

1

2     A.     I'm going to say no, because I
3 have no recollection of any contact with them
4 personally.

5     Q.     If not -- I'm trying to be
6 thorough here.

7            If not speaking to someone by
8 telephone or face to face, did you receive
9 instructions via e-mail or correspondence or
10 indirectly through staff?

11    A.     No communication, written,
12 verbal, audio or anything.

13    Q.     Did they ask you not to give such
14 an opinion?  Did they refrain you from giving
15 such an opinion?

16    A.     No.  No.

17    Q.     We've spoken about the fact that
18 typically when you prepare a narrative medical
19 report you do include your expert medical
20 opinion on the issue of causation?

21    A.     I'm going to say generally, yes.

22    Q.     Did Rubenstein & Rynecki ask you
23 to prepare a narrative medical report for this
24 case?

25    A.     I'm going to say no.  I will tell

59

1           Charles Alan Kaplan, M.D.

2    you, again, we sometimes do summary reports

3    and that's a combination of a report that I

4    make and Maria, who is the executive staff,

5    putting it together.  She will type in every

6    single word from the MRI, everything from

7    that.  But if there is a special request for

8    causality, that's going to be my opinion, but

9    I have no knowledge of any requests being made

10   specific to that.

11        Q.     I can't help but notice that the

12   June 14, 2017 follow-up report that I received

13   from counsel is signed and the August 2, 2017

14   follow-up report that you've been kind enough

15   to bring with you today is not signed.

16             What's the significance of that?

17        A.     This one was signed by me

18   (indicating), June 14th?

19        Q.     Yes.

20        A.     So let me see.

21        Q.     Sure.  Like in other words, what

22   does your signature on a follow-up report

23   signify --

24        A.     I have to see it.

25        Q.     (Handing.)

1          Charles Alan Kaplan, M.D.

2          A.    So I'm going to say this:  You

3    know, we do have a stamp.  Some things get

4    stamped.  I'm not going to say that's what was

5    there or that's my, you know -- sometimes the

6    secretary says, you know, this needs to be

7    signed.  I look at it, okay, they want some

8    signature to make it official.  This is my

9    note (indicating).  That is my note

10   (indicating).  I generally do not sign my

11   notes, and as you can see (indicating), it's

12   not signed in the computer.  So for me, it

13   doesn't hold any extra -- I'm standing by this

14   one signed (indicating) and this one not

15   signed (indicating) to the same, you know...

16              MR. KENDRIC:  Off the record for

17        a second.

18              (Discussion off the record.)

19        Q.    I didn't understand that last

20   answer at all, sir.  What do you mean by I

21   stand by this, I stand by that?

22        A.    Well, you know, this is my note

23   (indicating).  It's out of the computer.  I

24   can print it anytime and that's my note, okay.

25   So if you said, Dr. Kaplan, you know, was she

1              Charles Alan Kaplan, M.D.

2    walking with a cane on June 14th, I'm going to

3    say, yep, I have it here (indicating).  This

4    one (indicating), same thing.

5              So what is the signature?  To me,

6    it doesn't hold any more validity.  Somebody

7    must have wanted -- I'm going to say somebody

8    legal.  I don't know if it was you

9    (indicating).  I don't know if it was him

10   (indicating).  I don't know who it was.

11        Q.    On this June 14, 2017 report, is

12   that your signature?

13        A.    You know, it looks like my

14   signature because it does look to me a little

15   slightly different than a stamp, because we

16   have a stamp.  But, you know, again, to me it

17   does look like a signature.  It could be the

18   stamp.  I'm not betting my life either way on

19   that.  I'm not a forensic signature person,

20   but someone must have asked, and I -- I signed

21   it.  That's...

22        Q.    Okay.  But none of the

23   printed-out reports which came from your

24   computer bear your signature, they are all

25   unsigned?

Charles Alan Kaplan, M.D.

1

2    A.    Correct.  And I will tell you

3  this:  It's somewhere recently in the office

4  for new patients, so after this one,

5  obviously, now there is a signature in there.

6  Somebody wanted it, why, because they felt it

7  was too much trouble to come ask for

8  signatures or something.  So it's in there now

9  as a copy of my signature on the -- on the

10  note.

11    Q.    That doesn't actually get signed

12  by you, but they affix your electronic

13  signature to a document?

14    A.    Yes.

15    Q.    All right.

16         Now, without going into what your

17  opinion might be, first, do you have an

18  opinion as to whether Ms. Falero's claim of

19  head injury is causally related to the May 4,

20  2015 accident?

21    A.    I'm going to say this --

22    Q.    It's yes or no, because if you

23  do, I'll ask you about it.  I just want to do

24  this in an orderly way.

25         Without going into what your

63

1                    Charles Alan Kaplan, M.D.
2    opinion might be, do you have an opinion as to
3    whether Ms. Falero's claim of head injury is
4    causally related to the May 4, 2015 accident?
5           A.     I want to answer it off the
6    record first.  I don't want to bust you
7    either, but it's like --
8           Q.     Let's try it my way first.
9                  Do you have an opinion?
10          A.     I have an opinion about a lot of
11   things.
12                 MR. FAYYAZ:  As to the head
13          injury.
14          A.     This is my opinion --
15          Q.     But wait.  Wait.  Hang on a
16   second.  No disrespect.
17          A.     No, I'm not --
18          Q.     I'm not trying to shut you down.
19   I want to hear every single thing you have to
20   say, but I want to find out first in my own
21   way, if you don't mind, whether or not you do
22   have an opinion as to whether her claim of
23   head injury is causally related to the subject
24   accident, May 4, 2015?
25          A.     I'll answer it yes or no, if

64

1          Charles Alan Kaplan, M.D.

2    afterwards I can explain.

3          Q.    Of course.

4          A.    Can I say no/yes?  I'm going to

5    say -- I'm going to say yes, and then...

6          Q.    Just yes or no for now, have you

7    formed an opinion at this time as to whether

8    Ms. Falero's claim of neck injury is causally

9    related to the May 4, 2015 accident?

10         A.    Yes.

11         Q.    Have you formed an opinion at

12   this time as to whether Ms. Falero's claim of

13   lower back injury is causally related to the

14   May 4, 2015 accident?

15         A.    Yes.

16         Q.    Do you have an opinion, yes or

17   no, as to whether Ms. Falero's claim of right

18   shoulder injury is causally related to the

19   May 4, 2015 accident?

20         A.    Yes.

21         Q.    Sir, do you have an opinion as

22   to whether Ms. Falero's left shoulder injury

23   is causally related - we just covered right

24   shoulder, now the left shoulder - to the

25   May 4, 2015 accident?

65

1              Charles Alan Kaplan, M.D.

2         A.     Yes.

3         Q.     Do you have an opinion as to

4    whether Ms. Falero's claim of right hip injury

5    is causally related to the May 4, 2015

6    accident?

7         A.     Yes.

8         Q.     Do you have an opinion as to

9    whether Ms. Falero's claim of left hip injury

10   is causally related to the May 4, 2015

11   accident?

12        A.     Yes.

13        Q.     Do you have an opinion, sir, as

14   to whether Ms. Falero's claim of right knee

15   injury is causally related to the May 4, 2015

16   accident?

17        A.     Yes.

18        Q.     Do you have an opinion as to

19   whether Ms. Falero's claim of left knee injury

20   is causally related to the May 4, 2015

21   accident?

22        A.     Yes.

23        Q.     Do you have an opinion as to

24   whether Ms. Falero's claim of right ankle

25   injury is causally related to the May 4, 2015

1                    Charles Alan Kaplan, M.D.

2      accident?

3           A.      Yes.

4           Q.      Do you have an opinion as to

5      whether Ms. Falero's claim of left ankle

6      injury is causally related to the May 4, 2015

7      accident?

8           A.      Yes.

9           Q.      Do you have an opinion as to

10     whether Ms. Falero's claim of right foot

11     injury is causally related to the May 4, 2015

12     accident?

13          A.      Yes.

14          Q.      Do you have an opinion as to

15     whether Ms. Falero's claim of left foot injury

16     is causally related to the May 4, 2015

17     accident?

18          A.      Yes.

19          Q.      What is your opinion as to

20     whether Ms. Falero's claim of head injury is

21     causally related to the May 4, 2015 accident?

22          A.      How do you want that answer, yes

23     or no or causally, no causally, two words or a

24     sentence?

25                  MR. FAYYAZ:  Well, he just asked

1              Charles Alan Kaplan, M.D.

2         you if you have an opinion.  Now he's

3         asking you what is your opinion.

4              MR. KENDRIC:  Yes, that's

5         correct.

6         A.    My opinion is this --

7         Q.    Let's confine it to the head

8    injury.

9         A.    Okay.

10        Q.    Because we're going to go through

11   each of these separately.

12        A.    Yes.  So let me just -- let me

13   just -- one little thing here (perusing).

14              So I'm going to say this:  It's

15   my opinion she doesn't have a permanent head

16   injury from this accident; that while she did

17   have some complaints initially, and I did

18   mention it and I'm going to say not fully

19   documented, but after the first visit, it

20   really stopped being an issue of complaint

21   including -- well -- (perusing).

22              It appears that I have documented

23   here dizziness.  I mean, let me just see

24   something -- (perusing).  I don't have it

25   honestly in my notes as being an ongoing or

68

1              Charles Alan Kaplan, M.D.

2    further elaborated complaint, so -- does that

3    make sense?

4         Q.    Not at all.

5              MR. FAYYAZ:  Off the record

6         for --

7              MR. KENDRIC:  Well, let's stay

8         on the record because this is important

9         stuff.

10             MR. FAYYAZ:  Just so that we're

11        clear, Doctor, at first counsel asked

12        you if you have an opinion as to whether

13        or not the head injury --

14             MR. KENDRIC:  The claim of head

15        injury.

16             MR. FAYYAZ:  The claim of head

17        injury is causally related to this

18        accident.  You said, yes, you have an

19        opinion.

20             His second question, limiting it

21        to the claim of head injury is, what is

22        your opinion as to causation.  Now, the

23        answer you provided was, you don't

24        believe that Ms. Falero has a permanent

25        head injury from this accident, which is

1                    Charles Alan Kaplan, M.D.

2          fine, but what he's really asking you

3          is, what is your opinion as to whether

4          or not the head injury was caused by

5          this accident.

6                    MR. KENDRIC:  The claim of head

7          injury.

8                    MR. FAYYAZ:  Right, the claim of

9          head injury was caused by this accident.

10                   So you can answer that question,

11         and feel free to refer to your notes.

12         A.        I'm going to say this:  That,

13    again, on the initial examination, she did

14    have some complaints relating to that, which

15    I'm going to say are not in depth documented

16    and I'm going to say, from my opinion, they

17    mostly, you know -- again, I do have this

18    report of dizziness on the notes on top

19    always.  My understanding is this was not a --

20    a -- a repetitive complaint.

21                   She did have on physical

22    examination, that I documented later on, a

23    balance issue, and I recommended she speak to

24    her internist to get to see a neurologist.

25    She went to the internist, but he didn't refer

1              Charles Alan Kaplan, M.D.

2    her, so then I gave her a name of Dr. Lempert.

3    But I -- at that time, I'm not making a

4    connection between her balance disorder and

5    this accident.

6         Q.    You are or you're not?

7         A.    I'm not.

8         Q.    You're not?

9         A.    Not.  If a neurologist wanted to

10   supersede me on that, I would say, okay, but

11   I did not make that connection.

12        Q.    I don't think that you'll let me

13   put words in your mouth, but I'm just trying

14   to help things along.

15             Have you formed an opinion with a

16   reasonable degree of medical certainty as to

17   whether her claim of head injury is causally

18   related to the subject accident?

19        A.    I would say yes.  And sometimes

20   in notes when I write like this, I would

21   write, hyphen resolved.  You understand?  So

22   she did -- I'm saying she did have some head

23   complaints initially, which I'm stating are

24   not fully -- she had many other complaints

25   here, and by my notes, there's dizziness and

1                   Charles Alan Kaplan, M.D.

2      head pain, which I did even in the diagnosis

3      give her post-traumatic headache.  But I'm

4      going to say based on the review of my notes,

5      this did not represent a persistent issue that

6      came up, that I did not send her for a brain

7      MRI or something like that.  So I'm going to

8      say that from my notes and from my

9      recollection of her, I cannot say that I'm

10     documenting a persistent head injury problem

11     that on August 2nd is unresolved such as her

12     neck, her back and so forth.

13                  So the balance issue that I

14     started to see, I originally recommended she

15     speak to her internist because I did not think

16     that that was or should be taken -- at least

17     initially, from this, I thought she had to go

18     get a neurology workup.  And that didn't

19     happen, so I recommended that she see

20     Dr. Lempert in the last few months.

21                  But I'm not stating that that

22     balance disorder, which can be either from the

23     head or a number of problems, was from this.

24          Q.     This accident?

25          A.     Correct.  And if she is still

1           Charles Alan Kaplan, M.D.

2    complaining, I'm going to tell you that I

3    don't have all the documentation to say much

4    on that.

5           Q.      If a claim of head injury is

6    causally related to the subject accident, you

7    don't have medical documentation to support

8    that opinion?

9           A.      I'm going to say yes.

10          Q.      That you do not have medical

11   documentation to support the opinion arrived

12   here at the table that her head injury,

13   however short-lived, was causally related to

14   the happening of the accident?

15          A.      I would say whatever head

16   complaints, again, which I listed it here as

17   post-traumatic headaches, so she must have had

18   more than my notes reflect.  So if you want to

19   say from May 12th to June 9th, I'm accepting

20   that there was some head pain injury from

21   this, but not subsequently.

22          Q.      From May 12, 2015 to June 9th of

23   2015?

24          A.      Yeah.  I mean -- let me

25   double-check (perusing).

Charles Alan Kaplan, M.D.

Okay.  Yes.  I mean, I think I'm saying something plain.  I don't know why you seem shocked.  I mean, it seemed to resolve.

Q.     When?

A.     Really by the next visit.

Q.     Which was when?

A.     July 2nd.  I mean, again, unless I'm completely remiss about this.

Q.     It seems to have completely resolved by July 2nd of 2015?

A.     Yes, or to such an extent that it didn't come up in any further follow-ups. Although, there are patients, you know, that they sometimes don't tell you everything it's so minor to them.  But whatever headache issue that she seemed to have on May 12th, which I'm, again, saying --

(Telephone interruption.)

THE WITNESS:  Hold on.  Let me just get rid of this.

MR. KENDRIC:  Go ahead.

A.     So, you know, if you look in the history, she must have told me more about her head.  You know, she has the lip twitching

74

1               Charles Alan Kaplan, M.D.

2    there.  No vision changes, hearing changes,

3    smell changes, vision or taste, you know, so

4    it's --

5               (Telephone interruption.)

6        A.     An evaluation, you know, for that

7    day, I didn't think she was bleeding into the

8    head, and then it became a non-topic.

9               THE WITNESS:  I mean, am I wrong

10        here or --

11        Q.     You can't turn to him.

12        A.     My opinion is, from this injury,

13    she had some headache pain that seemed to

14    possibility have the duration of time of

15    accident through June 9th and I -- I don't

16    have it as being a focus of my evaluation of

17    her.

18        Q.     All right, and that's fine.

19               Here is my question:  Have you

20    arrived at that opinion right here at the

21    table right now?

22        A.     No.  I think that's my opinion

23    in an unwritten way by really it not being

24    addressed here, unless again, I'm completely

25    wrong on every single note.

1          Charles Alan Kaplan, M.D.

2     Q.     Dr. Kaplan, do you know what

3  I mean when I say "focal head injury"?

4     A.     Yeah.

5     Q.     What does that term mean to you?

6     A.     That there's a lesion -- that

7  there has got to be a documented lesion that

8  there's a point -- there's a focal point of

9  this part of the brain, that part of the brain

10  giving symptoms.

11     Q.     Now, review your notes, please,

12  whatever notes will be helpful to you.

13          Did Ms. Falero suffer a

14  laceration to any part of her body as a result

15  of this accident, a laceration?

16     A.     I believe no.

17     Q.     Am I correct in remembering that

18  your office notes document no ecchymosis about

19  the head area?

20     A.     Right.

21     Q.     And what is "ecchymosis"?

22     A.     Black and blue mark.

23     Q.     Dr. Kaplan, do you have the

24  opinion that Ms. Falero suffered a focal head

25  injury as a result of the subject accident?

1           Charles Alan Kaplan, M.D.

2      A.     No.

3      Q.     She suffered some headaches?

4      A.     For --

5      Q.     And I'm not trying to minimize

6 it, but is that the sum total of it, some

7 headaches for a short-lived period of time?

8      A.     I believe so.

9      Q.     Do you have any other or further

10 opinions not expressed in writing in your

11 follow-up office notes on the issue of whether

12 Ms. Falero's claim of head injury is causally

13 related to the subject accident?

14      A.     I would say this:  At a

15 subsequent point in time, there was a balance

16 issue that I detected and recommended she see

17 a neurologist, which I still think she should

18 do.  If -- and my original thinking was I did

19 not think it was related to the May 4, 2015

20 accident.

21           If a neurologist upon further

22 examination, an opinion -- you know, found

23 something and said, Dr. Kaplan, you missed it,

24 I might have to, what's the word, you know,

25 acknowledge that opinion.  But I have no other

1          Charles Alan Kaplan, M.D.

2  unwritten opinion about her head injury.

3          Q.     Has she been evaluated by a

4  neurologist?

5          A.     I don't believe yet.  She went

6  to Dr. Lempert.  It was several months ago.

7  I recommended she speak to the internist and

8  the referral, I said, that's not good enough,

9  I do want you to see Dr. Lempert.  It looks

10  like it was June -- (perusing).  Yeah, on

11  June 14th, I sent her to Dr. Lempert.

12          Q.     June 14th of 2017?

13          A.     Yeah.

14          And going to see the internist

15  was -- (perusing).  So on February 1, 2017 is

16  when I first recommended she see her internist

17  about the balance issues and the positive

18  Romberg test that she had displayed in the

19  office.

20          Q.     What is a "Romberg test" and what

21  does it test for?

22          A.     Basically, you have the patient

23  stand, they put their arms out, they close

24  their eyes.  Some people start wobbling and

25  falling right away.  Some people, you give a

1              Charles Alan Kaplan, M.D.

2    little, you know, push to the body and they

3    lose their balance.  And so that's the

4    description of the test, and it's a balance

5    disorder.  It can be in the cerebellum.  It

6    can be in the spinal tract.  But it's

7    generally a central nervous system issue.

8         Q.    Do you know or do your notes

9    document whether Ms. Falero consulted with her

10   internist regarding any complaint of loss of

11   balance or complaint of dizziness?

12        A.    So let me just see how my notes

13   read (perusing).

14              So my June 14th note, because I

15   had sent her to the internist, my note reads,

16   "She states she mentioned the balance issue to

17   her internist, but was not given a referral,

18   although neurology was reportedly discussed."

19        Q.    This led you on June 14, 2017 to

20   refer her to Dr. Lempert?

21        A.    Yes.

22        Q.    Who is a neurologist?

23        A.    Correct.

24        Q.    But as of today's date, we've got

25   no indication that she went to see

1          Charles Alan Kaplan, M.D.

2    Dr. Lempert?

3          A.     (Perusing.)  I don't believe

4    she's gone.

5          Q.     Dr. Kaplan, you're a board

6    certified physiatrist, true?

7          A.     True.

8          Q.     You've been practicing medicine

9    for how many years as a licensed physician?

10         A.     Licensed 1989, so it's 28 years.

11         Q.     I've got a splitting headache

12   right now.  Am I telling you the truth or not?

13         A.     I have no way of knowing if

14   you're lying to me or not.

15         Q.     Was it Ms. Falero's complaint of

16   dizziness that at least preliminarily caused

17   you to think that she may have sustained a

18   nonfocal head injury as a result of this

19   accident?

20         A.     Say that again.

21                MR. KENDRIC:  Can you read that

22         back, please?

23                (Record read.)

24         A.     I will say yes, in part, and it's

25   possible she also mentioned headache, which

80

1               Charles Alan Kaplan, M.D.

2    again, I will state again I don't have wording

3    documenting that, but in my assessment on the

4    first day, I did include post-traumatic

5    headache.

6          Q.     When did you first record a

7    positive Romberg finding?

8          A.     (Perusing.)  It looks like

9    February 1, 2017.

10         Q.     Okay.  I'd like to move ahead

11   when you're ready.

12                What is your opinion as to

13   whether Ms. Falero's claim of neck injury is

14   causally related to the subject accident?

15         A.     My opinion is that it's causally

16   related.

17         Q.     What do you base that opinion on?

18         A.     Patient history.  From what

19   I under -- well, patient history, MRI and

20   diagnostic findings that are clinically

21   consistent with her complaints.  And again,

22   it's not a full -- it's a little medical

23   record I have.  I don't have a prior MRI of

24   the neck, but mostly, the patient reporting.

25   And, again, she did state she had problems in

1          Charles Alan Kaplan, M.D.

2  these areas before, but the level of her pain

3  had become much worse.

4          Q.     Is Ms. Falero's subjective

5  complaint of increased pain in the cervical

6  region one of the bases for your opinion on

7  the topic of causation?

8          A.     Yes.

9          Q.     What are the other bases for your

10 opinion?  In other words, to speak English,

11 what are you basing that opinion on other than

12 Ms. Falero's subjective complaints of pain?

13              MR. FAYYAZ:  Other than the

14         patient history and the MRI diagnostic

15         test findings that he just mentioned?

16         Q.     Well, the patient history was

17 provided to you or provided to your office by

18 Ms. Falero, correct?

19         A.     Correct.

20         Q.     And she acknowledged that she

21 had pain in the neck preceding the subject

22 accident, correct?

23         A.     Correct.

24         Q.     We know that she's taking Robaxin

25 and other anti-inflammatory, narcotic

1               Charles Alan Kaplan, M.D.

2    pain-control medication and such prior to the

3    happening of the accident.

4               So here is my question:  What

5    nonsubjective medical evidence did you

6    receive?  So far I'm hearing MRI and

7    diagnostic findings clinically consistent with

8    her complaint?

9         A.     Correct.

10        Q.     Anything else?

11        A.     (No response.)

12        Q.     You understand I'm not arguing

13   with you?  The history is subjective.  It

14   comes from the patient.  The complaints are

15   entirely subjective.

16               I was joking around with you a

17   moment ago, I have a headache.  You have no

18   idea, right?

19        A.     And I agree with you.

20        Q.     And to a certain extent as a

21   medical practitioner, you have to take the

22   patient at her word, correct?

23        A.     Right.

24        Q.     Sometimes she has a motivation to

25   be truthful with you, sometimes she's not

1              Charles Alan Kaplan, M.D.

2    necessarily being untruthful with you, but she

3    could have a secondary motivation for making a

4    complaint; isn't that correct?

5         A.     Correct.

6         Q.     Okay.  So I don't want to get

7    bogged down on all of that.  Later on at

8    trial, we'll get bogged down on all of that.

9              But here, on my fact-finding

10   exercise, what are you basing your opinion on

11   that she was caused, caused, a neck injury in

12   the subject accident?

13        A.     Okay.  So --

14        Q.     Don't talk to me about an

15   exacerbation of a complaint.  Talk to me about

16   causation, please.

17              MR. FAYYAZ:  Well, as part of his

18        examination, he can talk about his --

19              MR. KENDRIC:  Of course.

20        A.     In terms of subjective complaints,

21   I can only go by what she tells me, okay, so

22   I'm relying on her completely for the history.

23   I did not examine or know of her before

24   May 12th.  So there's an event that happened

25   to her, which exacerbated her pain conditions

84

1          Charles Alan Kaplan, M.D.

2   as she's reporting them.  I know about her

3   history in some regards here.  She's honestly

4   told me in her understanding of what they are.

5                I have an examination that does

6   have, you know, physical findings of spasms,

7   of loss of motion, which are consistent with

8   complaints she's having, so there's

9   consistency, right.  I have MRI and

10  electrodiagnostic studies that are consistent

11  with her complaints, meaning they are not

12  completely different, you know, so they're

13  consistent with what she's complaining about,

14  and I said that, they're consistent with.

15               Causality, I'm going to say this:

16  In large part, it's my taking her at face

17  value about her complaints.  In terms of

18  having medical records or not having much

19  medical records, I only have one piece of

20  medical record which does not relate to the --

21  well, I have a few pieces.  I have -- I don't

22  have a neck MRI prior.  I do have a lower

23  back MRI prior to 2013.  What she told me,

24  what I have here, herniated cervical disc in

25  her past history is not documented in that

1              Charles Alan Kaplan, M.D.

2    past MRI, so when she told me she had a

3    herniated disc, that's her understanding or

4    her words, but it's not actually a fact, at

5    least by that one MRI I have.  Her lower back

6    MRI subsequent to this accident does show

7    three herniated discs.

8         Q.     This is the one that you sent her

9    for?

10        A.     Right.

11        Q.     Okay.

12        A.     So, again, a change in her lower

13   back MRI, which does indicate difference, does

14   indicate wow, that makes sense that she has a

15   worsening back pain.  It's consistent, okay,

16   that -- she reported to me she had knee

17   arthritis but, in fact, her knee MRIs did not

18   reveal arthritis.  So on some level, her

19   wordage that she gave me is not completely

20   accurate or an understanding of what we were

21   able to communicate.

22              So barring having any other --

23   and, again, I don't know how we got this MRI.

24   She brought it in.  That's all the office,

25   where we did it, sent it to us through HIPAA

1            Charles Alan Kaplan, M.D.

2    compliance, I don't know.  But barring the

3    fact of not having a lot of prior neck

4    information or any prior neck information, her

5    complaints of worsening pain are the main

6    reason.  And based on also knowing the

7    situations with her back, which I'm in

8    accordance with, I will -- again, all patients

9    I'm accepting that they're telling me, you

10   know, the best understanding of the truth that

11   they have.  So she has an event.  Her pain

12   goes from one level to another level.

13            She also -- when she first came

14   to me, we talked about trigger point

15   injections.

16       Q.    We're still on the neck, right?

17       A.    Yeah.  When she first came to me,

18   we briefly spoke -- let me see (perusing).  We

19   discussed trigger point injections on the

20   second visit.  It's not stated neck or back,

21   but in general.  She told me she did have them

22   in the past with another physician.  She felt

23   very sore from the injections, but she stated

24   they, in fact, helped, but she didn't want to

25   precede with any further injections.

1          Charles Alan Kaplan, M.D.

2               However, her mind changed.  Why?
3     The level of her pain stayed at that high
4     level, so, in fact, she did agree to undergo
5     trigger point injections for the neck, for the
6     back, epidurals, medial branch blocks for the
7     neck, for the back when initially she was
8     hesitant.  So to me, that's stating, look, I
9     was hoping it was going to get back to the way
10    it was before, I was hoping it wasn't going to
11    be at this high level.  I don't want to go
12    with injections, but now time has passed, it's
13    too much for me.  I want to go forward with
14    this.

15              Where I have no history of prior
16    epidural, medial branch blocks, so I'm relying
17    on her history, how she interacted with me
18    about various procedures.  So there is
19    causality of neck injury.

20         Q.    Causality of neck injury or
21    causality of neck symptomology?

22         A.    I'm going to say both because as
23    far as I know, at least in terms of imaging,
24    I -- again, I don't know who faxed these MRIs
25    to me or if she brought them in.  That's all

1                  Charles Alan Kaplan, M.D.
2    I have, all the medical workup she had in her
3    life on these things.
4         Q.     Say that again.  I'm sorry.
5         A.     Let's say, okay -- let's say --
6         Q.     I'm not asking you to expand.
7    I'm just asking you to repeat what you said.
8                  MR. FAYYAZ:  Well, we can have it
9         read back.
10        Q.     Or if you want to expand --
11                 MR. FAYYAZ:  Let's just have it
12        read back.
13                 (Record read.)
14        Q.     So Dr. Kaplan, if you will,
15   please, indulge me, pull out what you say was
16   faxed over to you.
17        A.     Again, faxed or brought it in.
18   I don't know.
19        Q.     Right.  Understood.
20        A.     (Perusing.)  (Handing.)
21        Q.     You pulled out for us a lumbar
22   MRI without contrast report and this was
23   performed on December 20th of 2013?
24        A.     Correct.
25        Q.     I don't want to go off on a side

1           Charles Alan Kaplan, M.D.

2    issue, but I did notice in several of your

3    office notes starting with the initial

4    evaluation on May 12th of 2015, you end your

5    note with "we will try and obtain prior

6    records"?

7           A.     Correct.

8           Q.     I see that on June 9, 2015, "we

9    will try and obtain prior records"?

10          A.     Right.

11          Q.     July 12, 2015, "we will try and

12   obtain prior records," and there are other

13   instances, but I don't want to get bogged down

14   on this.

15                 What prior records, sir, did you

16   try to obtain and what prior records were you

17   successful in obtaining?

18          A.     The one successful in obtaining

19   is this lower back MRI (indicating).

20          Q.     And for clarity of the record,

21   that's the lumbar MRI performed on

22   December 20, 2013, correct?

23          A.     Correct.

24          Q.     Any others?

25          A.     No others.

90

1                    Charles Alan Kaplan, M.D.

2         Q.        Any other medical information

3    that you have on your patient, Ms. Falero,

4    that preceded or predated the May 4, 2015

5    accident?

6         A.        No.

7         Q.        At all?

8         A.        At all.

9         Q.        Okay.  Let me just -- as

10   attorneys, we tend to beat things to death.

11   Let me just beat this one last thing to death.

12                  Are you saying to me, Dr. Kaplan,

13   that the entire universe, the sum total of

14   medical information that you have on

15   Ms. Falero from prior to the May 4, 2015

16   accident is this December 2013 lumbar MRI

17   report, interpretative report?

18        A.        Correct.

19        Q.        And nothing else?

20        A.        Nothing else.

21        Q.        All right.

22                  For example, do you know, sir,

23   if Ms. Falero had spasm upon palpation in the

24   cervical region prior to the happening of this

25   May 4, 2015 accident?

91

1              Charles Alan Kaplan, M.D.

2         A.     I don't know.

3         Q.     Do you know, Doctor, if she had a

4    quantitative or qualitative loss of range of

5    motion in her cervical region prior to the

6    happening of this May 4, 2015 accident?

7         A.     I don't know.

8         Q.     Can we talk for a moment about

9    the nerve conduction velocity and EMG testing

10   that was done of the upper extremities?

11        A.     Yes.

12               THE COURT REPORTER:  Is this an

13          okay time to use the restroom?

14               MR. KENDRIC:  Yes, of course.

15               (Recess taken.)

16        Q.     So Dr. Kaplan, on September 1,

17   2015, that being the year of this accident,

18   there was a nerve conduction velocity testing,

19   also electromyography done of Ms. Falero's

20   upper extremities, correct?

21        A.     Yes.

22        Q.     My reading of the report says

23   that both the left and right upper extremities

24   were normal on the NCV testing, normal for

25   both function and sensory?

92

1                   Charles Alan Kaplan, M.D.

2         A.      Motor and sensory.

3         Q.      "Motor and sensory"?

4         A.      Yes.

5         Q.      Motor power?

6         A.      No.  It's not checking power.
7    It's how quickly the signal moves up and down
8    the nerve.

9         Q.      Now, EMG testing,
10   electromyography, all upper extremity muscle
11   groups were normal and all paraspinal muscles
12   were normal except for left C5/6 and left
13   C6/7.

14                Am I reading that correctly?

15        A.      Correct.

16        Q.      Now, first of all, what is the
17   difference between nerve conduction velocity
18   testing and electromyography as referenced
19   here in this report?

20        A.      So --

21        Q.      They're both electrodiagnostic
22   tests?

23        A.      Correct.  Correct.

24                So the nerve conduction studies
25   are checking, in general, for peripheral nerve

1          Charles Alan Kaplan, M.D.

2     injury.  The other nerve is traveling -- it

3     starts in the neck, but it's traveling down

4     the arm, and people can get injuries to the

5     nerve in the extremities like the elbow, at

6     the wrist, anywhere along the line, but the

7     wrist and elbow are more the common ones, that

8     can give pain.

9               And by doing these tests, we're

10    able to see if things are normal and see if

11    things are not normal in -- regarding the

12    nerve function.  Nerves for muscle control

13    motion.  Nerves for sensory control sensation.

14    Q.     And please correct me if I'm

15    wrong, you're testing the speed at which an

16    electric impulse travels through a nerve from

17    point A to point B?

18    A.     Speed, and also the amplitude or

19    the size of the wave form, but yes, from A to

20    B.

21    Q.     How is that different from an

22    electromyography?

23    A.     Well, from the needle part --

24    because people will call electromyography at

25    times the combination of the two.

94

1                Charles Alan Kaplan, M.D.

2                But needle electromyography is

3    the needle part.  So the needle, there is no

4    electricity given to the patient.  The needle

5    is recording electrodes and it's put into

6    various muscles of the person, their arms and

7    their legs.  And the needle is looking for

8    abnormal signal, which is generated by a nerve

9    irritation.

10        Q.    What is the difference between

11   upper extremity muscle groups and upper

12   extremity paraspinal muscles?

13        A.    So when the nerve, which, you

14   know, starts from the spinal cord, when it

15   exits the foramen, it branches into two

16   branches, one is longer, comes down the arm,

17   one is shorter, comes to the neck muscle.  For

18   the back, it would go down the leg or to the

19   back muscles itself.

20        Q.    So the longer of the nerves would

21   feed or provide electrical impulses to the

22   biceps, the triceps and so forth, but the

23   shorter of the two, is that feeding the

24   paraspinal?

25        A.    Paraspinals.

1                Charles Alan Kaplan, M.D.

2          Q.      And where are the paraspinal

3    muscles?

4          A.      Back of the neck (indicating).

5          Q.      All right.

6                  Now, here, the left C5-C6 and

7    left C6-C7 "showed slightly increased

8    spontaneous activity."

9                  What does that mean, "showed

10   slightly increased spontaneous activity"?

11         A.      So the normal is no spontaneous

12   activity.  A normal healthy person without any

13   irritation on the neck has zero spontaneous

14   activity, meaning when you put the needle in

15   and the needle is in the person and you're

16   looking at the monitor, there is no wave form

17   going through the screen.  There is no

18   activity of a muscle, a muscle fiber, a nerve

19   fiber is not being fired.

20                 Spontaneous activity means the

21   needle is in the arm, the arm is at rest in

22   that particular muscle, and there is a signal

23   that's coming across the monitor of the EMG

24   machine.  You see a blip and you hear a sound,

25   so that is spontaneous activity.  It's not

1          Charles Alan Kaplan, M.D.

2  happening on its own.  That nerve is being

3  irritated up by the spine (indicating)

4  usually, and produces this signal.

5          So it gets graded at one plus,

6  two plus, three plus, four plus.  One plus is

7  just more than zero and less than two plus, so

8  it implies that your findings are two spots in

9  the muscle.  So if I put a needle in a muscle

10  and I see some spontaneous activity, because

11  you're always moving the needle, it's not just

12  one, you move it a little bit more, you get it

13  again, it's one plus.  Then I took the needle

14  out and did it again, a little above or below

15  that level, then she had that again.

16      Q.     You did it or the technician?

17      A.     I do the needle.  Technician did

18  the nerve conduction studies.

19      Q.     I understand what you're telling

20  me about placing the needle in different areas

21  of that same muscle or paraspinal muscle, I

22  understand that.

23          But here's my question to you:

24  Did you or your medical practice ever do a

25  repeat nerve conduction velocity test or

1              Charles Alan Kaplan, M.D.

2   repeat EMG test to see if you could replicate

3   the results that you found here on this

4   September 1, 2015 series of tests?

5        A.     No.

6        Q.     What is your opinion as to

7   whether Ms. Falero's claim of lower back

8   injury was caused by this accident?

9        A.     My opinion is that it was caused

10  by the accident.

11       Q.     What do you base that opinion on?

12       A.     Again, her history, or, again,

13  from the May 4, 2015 incident/accident, that

14  she had worsening of her pains, that there's,

15  you know, consistent examination with that

16  complaint.  There's MRI findings that is

17  significant and clinically correlates with

18  her complaint.  That is new compared to a

19  pre-May 4, 2015 MRI 2014.

20       Q.     Once again for clarity, you're

21  referring to that December 2013 lumbar MRI

22  that was done?

23       A.     Correct.

24       Q.     Anything else that you reply upon

25  or that you base your opinion on?

98

Charles Alan Kaplan, M.D.

1

2     A.    Well, the EMG is also consistent.

3  She had a lumbar radiculopathy.  And, again,

4  that kind of EMG finding is consistent with,

5  I'm going to say, relatively acute nerve

6  irritation, so it's consistent.

7     Q.    You mentioned a moment ago that

8  you rely, in part, on the electrodiagnostic

9  testing that was done of the lower

10  extremities?

11     A.    Yes.

12     Q.    What date was that done,

13  August 4, 2015?

14     A.    Correct.

15     Q.    Now, on the nerve conduction

16  velocity testing, the technician found a

17  decreased amplitude with respect to the left

18  peroneal nerve?

19     A.    Correct.

20     Q.    Both motor and sensory?

21     A.    No.  The left peroneal is a motor

22  nerve and there was amplitude with that on

23  stimulation.  The sensory was the left sural

24  nerve.

25     Q.    Pardon me on that.

99

1          Charles Alan Kaplan, M.D.

2               A decreased amplitude, what does

3     that mean?

4          A.     So when you give somebody

5     electric stimulation, you start at a low shock

6     intensity.  You feel it.  It's mild.  Because

7     it's a low intensity, it doesn't stimulate

8     every nerve -- fiber in that nerve.  That

9     nerve is like a cable.  There's tens of

10    thousands fibers in there.  So on a low

11    intensity, you don't stimulate them all, so

12    you get a few, so the blip will be small.

13              As you increase the intensity,

14    the blip gets more, meaning you're activating

15    and stimulating more fibers.  And you do that

16    until that blip stops increasing so that

17    you're at maximum.  That maximum is less than

18    standard normal that some people use.

19         Q.     "That some people use," what does

20    that mean?

21         A.     So when you do a test, like if

22    you said, does she have, you know, a peroneal

23    neuropathy, this is a mild -- I'm not going to

24    say insignificant, but close to an

25    insignificant finding in that things like the

1                Charles Alan Kaplan, M.D.

2    onset where she has 5.5, which is normal being

3    less than 7, is a much more significant value.

4    And for many, you know -- even though this is

5    computer generated, you'll find many textbooks

6    that do not pay attention to amplitude, but it

7    gives some indication, but it's not -- no one

8    is going to do a surgery on this nerve on that

9    volume -- value.

10                This is anything from -- one

11   possibility is aging.  For all neurological

12   diseases, or almost all, legs are always

13   affected more than arms, so you will sometimes

14   see a low value in their arm.  People can have

15   thick calves sometimes, thick legs, swelling

16   in an ankle, so the intensity, even though

17   you're on maximum, can't penetrate through

18   swelling, so it's a small finding.  It's not

19   a big finding.

20        Q.    The reduced amplitude in the left

21   peroneal motor nerve?

22        A.    Correct.

23        Q.    And it is a small finding on the

24   reduced amplitude of the left sural sensory

25   nerve?

1          Charles Alan Kaplan, M.D.

2     A.     Correct.

3     Q.     Okay.  So this could be --

4 because we don't know for certain, this could

5 be attributable to patient age?

6     A.     Patient age, slight body habitus,

7 swelling in the ankle, swelling in the leg.

8 You know, she came in on August, so it's not

9 cold.  Sometimes that could happen on a cold

10 day.  But that also is not a, you know,

11 significant -- very significant.

12     Q.     Right.  We're not going to run

13 into surgery based on that finding?

14     A.     Right.

15     Q.     Now, let's look at the EMG

16 testing, lower extremities, August 4, 2015.

17          All muscle groups are normal,

18 correct?

19     A.     Extremity, lower.

20     Q.     I apologize to you, all extremity

21 muscle groups normal.

22          But then all paraspinal muscle

23 groups were normal except there was a finding

24 of the right L4-L5 and there was a finding on

25 the left side at L5-S1?

1                  Charles Alan Kaplan, M.D.

2        A.      Correct.

3        Q.      What was the finding?

4        A.      Again, spontaneous activity.

5    This one is fibrillation potentials.  There's

6    two main ones, fibrillation potentials and

7    positive sharp waves.  She had fibrillation

8    potentials.  It's just really a difference of

9    almost how the signal is moving towards or

10   away from the needle, and they're equal in

11   terms of what they mean.

12                  So, again, she has one plus.

13   She did not have two plus, she did not have

14   three plus, which implies more.  You'll see

15   more on the screen.

16       Q.      The "one plus" is the slight

17   deviation from whatever the examiner is

18   considering normal?

19       A.      Correct.

20       Q.      The only thing below one plus is

21   zero --

22       A.      Correct.

23       Q.      -- which is in the examiner's

24   view completely normal?  But it goes up to --

25   what did you say?

103

1               Charles Alan Kaplan, M.D.

2        A.      Four plus.

3        Q.      Four plus, that's a more severe

4   finding?

5        A.      Correct.

6        Q.      I asked you the same type of

7   question.

8               Did you or did your office ever

9   conduct repeat NCV or EMG testing of the lower

10  extremities in an attempt to replicate the

11  findings from the August 4, 2015 testing?

12       A.      The answer is no, and I will say

13  that is acceptable practice.  Sometimes when a

14  surgeon is deciding to go into surgery, he may

15  want a new one, but with MRIs, a lot of people

16  will say, oh, I'll get an MRI and see if it

17  went away.  It's not within the average or

18  even the typical thing is to repeat it, so,

19  yeah.

20       Q.      Say that again.

21       A.      You asked me if I repeated it,

22  and I said no, but I'm stating it's, you

23  know -- it's within acceptable medical

24  practice to not have that.  You are generally

25  not doing these serially or sequentially.

104

1           Charles Alan Kaplan, M.D.

2      Q.      I understand that.

3              Was there anything found on the

4    September 1, 2015 upper extremity series or

5    the August 4, 2015 lower extremity series that

6    was serious enough or significant enough to

7    you, as the physician, to cause you to send

8    her out for further testing like -- just to

9    complete my thought, was anything worrisome

10   from what you saw on these two series, upper

11   extremity and lower extremity, that you felt

12   the need as the physician to do something to

13   explore the situation further?

14     A.      No.  The test was fine.  She had

15   MRIs.  There was nothing further that needed

16   to be done.

17     Q.      She was fine, meaning what?

18     A.      No, she is not fine.  The test,

19   speaking for themselves, is fine and complete

20   as an evaluation for her.

21     Q.      Dr. Kaplan, just for the sake of

22   thoroughness, do you have any other opinion

23   with respect to Ms. Falero's claim of neck

24   injury that we have not already covered here

25   in today's deposition?  I'm not asking you to

1                    Charles Alan Kaplan, M.D.
2    repeat yourself necessarily, but I'll hear it
3    again if you want to give it to me.  Something
4    that you have not expressed already?  There's
5    nothing expressed in writing and I'm trying to
6    get it from your own mouth directly.
7         A.     No.
8         Q.     Do you have any further or
9    additional opinion with respect to
10   Ms. Falero's claim of back injury being
11   causally related to this accident?
12        A.     No.  I think I stated what I
13   needed to state.
14        Q.     Do you have any further or
15   additional opinion in your capacity as her
16   treating physiatrist with respect to
17   Ms. Falero's claim of back injury?
18        A.     Her claim of it?  I'm not sure
19   what you mean.  She's claimed it, I know that.
20        Q.     Then let me apologize to you and
21   be more specific.
22        A.     Okay.
23        Q.     We know, don't we, that
24   Ms. Falero had a prior medical history
25   involving lower back pain, correct?

106

1                Charles Alan Kaplan, M.D.

2      A.      I'm going to say yes.

3      Q.      Do you know for how long a period

4  of time prior to the happening of the May 4,

5  2015 accident Ms. Falero was complaining about

6  lower back pain, was seeing physicians for

7  complaints of lower back pain?

8      A.      I don't have clear information on

9  that.

10     Q.      Do you have any information on

11  that?

12     A.      I know at some point, you know,

13  she told me she stopped working in 2002 and

14  then she went out on disability, I think, in

15  2007.  I don't have clear information on that,

16  if it was for one of her diagnoses, a

17  conglomeration of her diagnoses.

18              I'm under the impression it was

19  for some time.  I don't think she got

20  morphine, 60 milligrams, you know, the day

21  before she came to see me for having back pain

22  one day.  So I don't have a clear time frame,

23  but I would venture to say it's a while.

24     Q.      I'm really not asking you to

25  speculate.  I'm asking --

107

1          Charles Alan Kaplan, M.D.

2     A.     Then the answer is, I don't know

3 the date she started.

4     Q.     No.  No.  That's fine.  I'm just

5 starting my next question.

6     A.     Oh.

7     Q.     I'm really not asking you to

8 speculate, but was there anything about

9 Ms. Falero's affect presentation to you at the

10 time of your May 12, 2015 initial evaluation

11 which gave you clues of a medical nature in

12 terms of how long she had been taking morphine

13 at the high dose that she reported to you?

14     A.     Nothing about her affect.  I

15 mean, she didn't appear drowsy or slovenly

16 or anything like that.  I would say on some

17 level, I found her to be exceptionally

18 truthful because there are patients who

19 sometimes don't tell you stuff, you know, on

20 the first day they see you or something like

21 that.  So she listed everything very

22 forthright on that.

23     Q.     What is your opinion, sir, as to

24 whether Ms. Falero suffered a right shoulder

25 injury as a result of this May 4, 2015

108

1          Charles Alan Kaplan, M.D.

2    accident?

3          A.    My opinion is she did suffer a

4    right shoulder injury due to the May 4, 2015

5    accident.

6          Q.    And, please, tell me what you

7    base that on.

8          A.    Again, her -- giving me the

9    history that -- being she was having a

10   worsening before, from MRI finding that --

11   let me just pull it up (perusing).

12              Again, she had an MRI finding on

13   July 27, 2015, which again, did reveal an

14   anterior dislocation of the biceps tendon, so

15   the biceps tendon came out of place, and there

16   was a partial thickness tear of two tendons

17   there, two of the rotator cuff tendons.

18   Again, it's consistent with her complaints

19   medically.  I have no clear -- I have no

20   record of anything worked up on her right

21   shoulder before and these are, you know --

22   especially the biceps tendon being out of

23   place, traumatic injuries.

24         Q.    Anything else that you are

25   relying upon in formulating your opinion with

1          Charles Alan Kaplan, M.D.

2     respect to the right shoulder?

3          A.     No.  Again, my examination, my

4     physical examination, showing restrictions is

5     consistent, but no, nothing other than that.

6          Q.     Dr. Kaplan, do you know if

7     Ms. Falero had restrictions in her ability to

8     move her right shoulder prior to the happening

9     of this May 4, 2015 accident?

10         A.     I do not.

11         Q.     In other words, you don't know

12    one way or the other?

13         A.     Correct.

14         Q.     How about restrictions in the

15    different planes of range of motion in the

16    lumbar spine?

17         A.     I don't know.

18         Q.     How about the cervical spine?

19         A.     I don't know.

20         Q.     Sir, what is your opinion with

21    respect to whether Ms. Falero suffered a left

22    shoulder injury as a result of this May 4,

23    2015 accident?

24         A.     It's my opinion she did suffer a

25    left shoulder injury due to this accident.

110

Charles Alan Kaplan, M.D.

1

2  Q.    I apologize for being so boring

3  at this point, but what are you basing your

4  opinion on at this point?

5  A.    Again, the patient history,

6  examination findings is consistent with what

7  she was telling me about her complaints, MRI

8  findings consistent with that, including

9  again, two tendon tears.  The MRI of the left

10  shoulder was March 3, 2016.  There was

11  contusion and edema still of the humeral head.

12  There were cartilage tears, otherwise known as

13  labral tears or SLAP tears.  She had a partial

14  tear of the biceps muscle and tendon, and

15  there was some hypertrophy or arthritic

16  changes of the acromioclavicular joint, which

17  that probably was somewhat longstanding.

18  Q.    Anything else that you're basing

19  that opinion on, anything else that you are

20  relying upon in coming to or arriving at that

21  opinion?

22  A.    No.

23  Q.    Sir, do you have any other or

24  further opinion with respect to Ms. Falero's

25  right shoulder or left shoulder?

111

1              Charles Alan Kaplan, M.D.

2        A.      Opinions on causality?

3        Q.      Opinions on causality, for one.

4        A.     No.  My opinion is that it's from

5    this accident, May 4, 2015.

6        Q.      Now, would you agree with me that

7    one component which provides the basis for

8    your opinion on causality with respect to the

9    cervical spine and the shoulders is a lack of

10   any medical documentation to indicate or

11   signal a problem in these areas preceding or

12   predating the May 4, 2015 accident?

13       A.      I will say that in large part,

14   yes, but, you know, again, that, I guess has

15   to be quantifiable, meaning hypothetical, if

16   she had a doctor's note from two years prior

17   where she mentioned a shoulder or neck pain -

18   and again, we're talking hypothetical, I don't

19   know - and he made mention of it and the

20   motions she described were fairly normal and

21   he never sent her for an x-ray and he never

22   sent her to an orthopedist or to -- you know,

23   that's one thing.  If there's a note from

24   May 3, 2015, I've stressed to the patient the

25   absolute urgency for immediate neck surgery

1          Charles Alan Kaplan, M.D.

2  based on this MRI and this EMG and the three

3  other surgeons recommending it and I told her

4  I will not be her doctor if she doesn't do

5  this, then I'm going -- I would be less apt to

6  say that.

7          But, you know, even if you had

8  an MRI, let's say, from one year before that

9  showed a herniation, same level, but she never

10  required, you know, certain amounts of care,

11  there's consideration of epidurals, surgery

12  and so forth, this accident can make something

13  that is seemingly mild, just like her general

14  complaints, go from something she can live

15  with and manage with medication and not

16  require procedures to this level that she

17  can't.  And so even if you had an MRI, it

18  doesn't completely -- it doesn't necessarily

19  refute my opinion that I would -- that I could

20  stand by this, I could.

21          So I'm just saying this because

22  you said, if I had records, that's what I'm --

23  but I'm also saying yes, but that's not the

24  full criteria.  I still can analyze that

25  prior -- it's not any prior medical record

1          Charles Alan Kaplan, M.D.

2    that you can throw at me and say, I have a

3    piece of paper from Dr. Smith, 2012, your case

4    is invalid.  No, I'm not saying that.  It

5    would have to be, again, medically consistent

6    to change my opinion.

7          Q.    Okay.  I understand what you're

8    saying.  You would like to see as, an example,

9    the length of time prior to May 4, 2015 that

10   she was complaining about pain or difficulty

11   with a certain body part or a certain body

12   function before revisiting your opinion?

13         A.    Not just length of time --

14         Q.    Not just length of time, but --

15         A.    -- but severity, options

16   discussed with patient, tests sent for,

17   specialists called into the case.  All of

18   that, you know, would have to be included and,

19   you know -- yeah, you know, that's the whole

20   pack -- it's not just one note that can refute

21   my thing.

22         Q.    Right, because you, as a

23   physician, like to have all the information

24   at your disposal before coming to a final

25   opinion?

114

1                    Charles Alan Kaplan, M.D.

2        A.     You know, I'm giving you my

3   final opinion.  I think that as -- I won't

4   quote "a lot," but sometimes the words I use

5   is -- with a reasonable degree of medical

6   certainty, I think it's incumbent on you to

7   have to produce something real and not make me

8   live in a hypothetical that that's the

9   situation.

10              So do I want to see all, no.  I'm

11  giving you my opinion.  That is my opinion,

12  not changing.  You have to change it.  I'm not

13  retracting my opinion because you're raising a

14  hypothetical, understand?

15       Q.     Yes.

16       A.     Or even verified in your mind,

17  understand?

18       Q.     Now, we know that prior to

19  Ms. Falero walking into your office, by her

20  own account, she was suffering from bursitis.

21              What body parts did that affect,

22  the bursitis?

23       A.     She told me her hips.

24       Q.     Bilateral hips?

25       A.     Correct.

1          Charles Alan Kaplan, M.D.

2     Q.     What is your opinion with respect

3 to whether Ms. Falero suffered a hip injury on

4 either side as a result of the subject

5 accident?

6     A.     I do believe she suffered an

7 injury from this May 4, 2015 accident to the

8 hips.  Let me just pull something -- you know,

9 it was to both hips, one is worse than the

10 other.  Let me just see here (perusing).

11          So on the left hip, left hip MRI,

12 July 22, 2015, she did have a partial tear of

13 the gluteus medius tendon.  It's a muscle

14 tendon in the buttock.  It's deep to the main

15 buttock level.  So, again, this implies that

16 there is, you know -- this is a physical

17 injury.  This is not a degenerative thing.

18 This is something like immediate, rush

19 push-off with the leg trying to move quickly

20 that can tear a muscle like that.

21          She also had a tear of the

22 labrum, which is a cartilage.  She did have

23 degenerative changes, which is arthritis,

24 which is not related -- the degenerative

25 change itself is not, let's say, caused by

1          Charles Alan Kaplan, M.D.

2    this accident of May 4, 2015.  Levels of

3    inflammation around degenerative changes can

4    go up or down based on exacerbation including

5    this accident.  But the tendon tear of the

6    gluteal muscle, the cartilage tear is an

7    indication of physical trauma to the left hip.

8               In the right hip, again, she did

9    have some degenerative changes, which I'm

10   going to say those degenerative changes were

11   not caused by the May 4, 2015 accident.

12   Levels of symptomology can come because --

13   again, she told me she had bursitis, but she's

14   already been proved twice wrong in what she

15   told me.  She told me she had a herniated disc

16   and she did not have it before on the lower

17   back and to me, she told me she had arthritis,

18   when, in fact, the MRI did not reveal

19   arthritis.

20        Q.     You said "x-ray" before.  I don't

21   know if you meant to or --

22        A.     MRI.

23               So the MRI of her back, she told

24   me she had a herniated disc before this, but

25   the MRI that I have before doesn't show it.

1          Charles Alan Kaplan, M.D.

2    She told me she had knee arthritis.  When we

3    did the MRI of the knee, there is no arthritis.

4          Q.    So you never did a left knee

5    x-ray?

6          A.    Correct.

7          Q.    Okay.

8          A.    But we did an MRI, which can show

9    arthritis.  And so, you know -- she said she

10   had bursitis.  Again, given -- if I give her

11   that, as she is accurate on that, then her

12   doctor or she did not believe she had

13   arthritis in the hip, which she has, which I'm

14   not saying was caused from May 4, 2015, but

15   symptomology related to the arthritic change

16   can commence on that day.  And there was a

17   question of a labrum tear.  The radiologist

18   did not read it as definitive.

19         Q.    So you're basing it on the

20   patient history, you're basing it on the MRIs,

21   you're basing it on findings in the office?

22         A.    Yes.  She had restrictive motion

23   in her hip on examination.

24         Q.    Anything else?

25         A.    No.

118

Charles Alan Kaplan, M.D.

1    Q.    I think you recognize by this

2 point in the day, I'm not here to fight with

3 you on any of this.

4    A.    I know.  You're a good guy.

5    Q.    You're also basing this on a lack

6 of medical documentation regarding problems

7 with her hip prior to the time of the subject

8 accident, and it's not really a got-you

9 question.  I just want to know how strongly

10 you feel about this.

11    A.    I'm going to say -- take the

12 hips, for example.  I will say, in large part,

13 because if she's telling me that she had this

14 accident and now her hip pain is worse than

15 three days ago, even if she had an MRI of her

16 hip three days before this, that accident

17 caused worsening in her mind, at least, pain.

18            And what we want is to maybe push

19 away pain and things like that.  She apparently

20 wasn't using a cane, she went to using a cane.

21 So even, you know, when you talk about that,

22 you -- it seems to be, and I don't want to put

23 words in your mouth, that if you have anything

24 in the world before May 4th that it can

1              Charles Alan Kaplan, M.D.

2    strongly refute or conceivably -- or even hold

3    that possibility, I'm going to say I don't

4    really accept that.  I'm open to the possibility

5    that I could have to say some other words, but

6    in terms of saying everything before can be

7    admitted as a refutation, I -- I can't go

8    along with that.

9         Q.    I'm sorry.  That was a lot and --

10        A.    So the last thing I think you

11   were trying to say, in part, and I don't want

12   to hit you over the head, that's what you

13   said, something or another.

14             Also on the fact that she doesn't

15   have past medical records of the hip that I

16   don't have.  And I'm saying, you know, yes,

17   in part, but I'm saying with this -- I'm not

18   going to say caveat, but with this

19   distinction, even if I did have them and even

20   if they showed something, that's not a

21   hands-down refutation of the statement I just

22   made, that I do think her hip is caused -- you

23   understand?  It's not an absolute that you can

24   produce anything you want from before May 5th.

25        Q.    I understand and you should keep

120

1                   Charles Alan Kaplan, M.D.

2    repeating that to me.

3                   The deficits that you found on

4    your hip range of motion testing in the

5    office, do you know whether Ms. Falero had

6    such deficits prior to the time of the May 4,

7    2015 accident?

8         A.     No, I don't.  That's every body

9    part.  That's the situation.

10        Q.     Okay.  So if you keep bearing

11   with me, I'll keep bearing with you.  How's

12   that?

13        A.     That sounds fair.

14        Q.     Do you have any other opinion on

15   the topic of causation with respect to either

16   hip, anything that you have not expressed

17   already?

18        A.     No.

19        Q.     Tell me, please, what is your

20   opinion with respect to whether Ms. Falero

21   suffered a right or left knee injury as a

22   result of this May 4, 2015 accident?

23        A.     It's my opinion she did suffer a

24   left and right knee injury due to the May 4,

25   2015 accident.

121

1                    Charles Alan Kaplan, M.D.

2          Q.      Please tell me on the record what

3    you're basing that on, the entirety of what

4    you're basing that opinion on.

5          A.      Again, patient history, a little

6    bit of physical examination, a significant

7    part of the MRI being medically consistent

8    with that.

9          Q.      Anything else, sir?

10         A.      No.

11         Q.      Each time in your office, this

12   patient, Ms. Falero, I believe, 65 years of

13   age when she first came to see you,

14   approximately 160 pounds, when you examined

15   her knees, was she able to extend her knee

16   like into the fully locked position or zero

17   degrees?

18         A.      Correct.

19         Q.      And she would consistently, and

20   this is on both sides, right and left, sir?

21         A.      Correct.

22         Q.      And she would flex the knee or in

23   layman's terms, bend the knee to 110 degrees

24   on both sides?

25         A.      Initially, that's correct.

122

1                    Charles Alan Kaplan, M.D.

2         Q.      Did that improve or get worse?

3         A.      At some point, it went up to 115.

4    I have to check if that was probably after her

5    surgeries.

6         Q.      You note that you felt mild

7    crepitus in the knees.

8                 What is "crepitus" and what is

9    "mild crepitus"?

10        A.      Crepitus is a sound, generally,

11   so you hear a crackling or crunching sound

12   within the knee.  It's mild.  I mean, you can

13   hear it from across the room sometimes.

14   Sometimes it's just mild, you hear a little

15   bit in the knee when it's being moved, while

16   you're moving it, and it's usually arthritic.

17        Q.      Did she develop the arthritis in

18   her knees between May 4, 2015 and eight days

19   later when you first saw her in your office on

20   May 12th?

21        A.      Well, I didn't necessarily

22   diagnose her with arthritis.  She told me she

23   had arthritis.

24        Q.      No, I understand.  But that

25   finding, that objective finding of crepitus,

1        Charles Alan Kaplan, M.D.

2  is that indicative of -- well, first of all,

3  is it indicative of a degenerative condition

4  existing within the knees?

5        A.    I will say this:  That is -- by

6  far, the most likely condition is arthritis,

7  but there are, you know, other conditions that

8  will produce noise.  If you have a tear in the

9  cartilage (indicating), like a tear, not an

10  arthritic change, and the edge is rough, you

11  know, you're going to hear something.  It may

12  be different, you know -- arthritis is two

13  rough edges rubbing over (indicating).  So

14  arthritis is the number one cause of the

15  crepitus sound.

16            Other injuries can produce sound.

17  It's indistinguishable from crepitus, but you

18  can see on the MRI, it's normal, there's no

19  arthritis.  Even on an x-ray if it says

20  arthritis or no arthritis, that finding, the

21  crepitus, is likely arthritis, but it's not

22  the only criteria.

23        Q.    Would you tell me, what is the

24  Lachman test and what are you testing for?

25        A.    The Lachman test is a test for

124

1              Charles Alan Kaplan, M.D.
2    stability of the knee, so you sort of --
3    here's the knee joint (indicating).  You have
4    one hand above (indicating) and one hand below
5    (indicating), and you motion test and you're
6    trying to see if there's motion.  In the two
7    bones, if you have good ligaments, you can't
8    slide them past each other (indicating).  They
9    are held intact by the cruciate ligaments.
10   That's really what you're testing, so you see
11   you can't have motion.  If it's torn, they're
12   not connected, you're going to move.
13              So the Lachman test is a test of
14   the -- the anterior cruciate ligament test,
15   which was negative, meaning that aspect was
16   normal.
17        Q.     Is the McMurray test a different
18   type of instability test?
19        A.     The McMurray test is really --
20   yeah, it's different.  It's not really a
21   stability test.  It's a test of torn meniscus.
22        Q.     I apologize if I'm remembering
23   wrong.  Is McMurray where the examiner presses
24   down on the patella and tries to move it?
25        A.     No, that's a Ballottement test.

1            Charles Alan Kaplan, M.D.

2    The McMurray test doesn't test all meniscus

3    tears.  It's mostly in the posterior quadrant.

4    You bend the knee up (indicating), you bring

5    it in (indicating) and with some pressure

6    (indicating), and then you go into a full

7    extension mode, so this was negative.

8            Q.     And it remained negative?

9            A.     Yeah.  I think it remained

10   negative, yeah.

11           Q.     Sir, do you have any further or

12   additional opinion on the issue of causation

13   with respect to either knee?

14           A.     No.

15           Q.     What is your opinion with respect

16   to whether Ms. Falero suffered a right or left

17   ankle injury as a result of this May 4, 2015

18   accident?

19           A.     My opinion is she did have a

20   causally-related injury from the May 4, 2015

21   accident.

22           Q.     What are you basing that on?

23           A.     Again, based on history,

24   examination, and I will say that -- let me

25   just double-check and make sure (perusing).

126

1        Charles Alan Kaplan, M.D.

2            So in terms of the ankle, I did

3   not obtain that MRI because I felt it was a

4   much more milder strain and it didn't warrant

5   further workup.

6        Q.    Was it on both sides?

7        A.    Of the ankles, yes.

8        Q.    Have her ankle strains, right and

9   left, resolved?

10        A.    Totally resolved, no.  What I

11   have, last note, feels all right -- "She feels

12   the left and right ankle and feet are mild and

13   not often."  So not fully resolved,

14   significantly resolved, no.

15        Q.    So I believe that it is your

16   opinion that Ms. Falero suffered bilateral

17   foot injuries as a result of this May 4, 2015

18   accident?

19        A.    Correct.

20        Q.    And I believe that that's based

21   on the history that she gave you and your

22   examination of her, but nothing else?

23        A.    She had a -- hold on (perusing).

24        Q.    She had prior surgery to the one

25   foot --

127

```
 1                Charles Alan Kaplan, M.D.
 2        A.       Right.
 3        Q.       -- with screws?
 4        A.       I don't see screws -- hold on
 5   (perusing).
 6        Q.       I thought I saw screws over the
 7   metatarsal?
 8        A.       Let me see ( perusing).
 9                 No, I don't see -- I don't see
10   any comment here about metal in the foot.
11   It says, postoperative changes, all of her
12   ligaments and all of her tendons were intact.
13        Q.       Dr. Kaplan, have you ever seen
14   the emergency department chart from Kings
15   County Hospital --
16        A.       No.
17        Q.       -- where she went immediately
18   following this accident?
19        A.       No.
20        Q.       What injury did she sustain to
21   her feet?  Was it a strain?
22        A.       Strain, a mild strain.
23        Q.       Taking a look, please, at your
24   most recent evaluation from earlier this
25   morning, have those strains resolved?
```

1          Charles Alan Kaplan, M.D.

2     A.     I will say not totally, but

3 significantly.  She had mild pain.  I'll just

4 say, again, initially, as compared to other

5 body parts, her feet were not the worst.

6          At one point, they flared up a

7 little bit.  There was consideration to send

8 her to the podiatrist, and then they went down

9 again.  We agreed she didn't need the

10 podiatrist.  So it's a mild strain, didn't

11 need to see a doctor or get surgery or

12 anything like that.

13     Q.     Now, I really have not had an

14 opportunity to go through your August report.

15 Can you please summarize, what is her state of

16 health at this present time?

17     A.     All right.  So I will say this --

18 let me also take a moment to read this

19 (perusing).  So in terms of -- I'll read you

20 the plan and that may explain some things.

21     Q.     Sure.

22     A.     So we continued her on physical

23 therapy, but just once a week at this point.

24 I did recommend she follow up with Dr. Moise,

25 the pain management doctor.  Why?  Even though

1          Charles Alan Kaplan, M.D.

2    she had very good results with the epidurals,

3    the medial branch blocks, there was some

4    aspect of the pains starting to come back, and

5    I recommended she speak with him about a

6    spinal cord stimulator -- a spinal cord

7    stimulator to help control chronic pain.

8              I'm not saying I strongly stated

9    she had to have it, but I did recommend that

10   she should speak to Dr. Moise as a

11   consideration.  As a doctor, I'm supposed to

12   talk about options and she was still having

13   pain.  And I believe she has not as of yet

14   seen Dr. Moise to discuss that.  He may

15   recommend that.  He may recommend repeat

16   epidurals.

17             I, in addition, recommended that

18   she follow up with Dr. Faloon just to get one

19   more contact with him and opinion to consider

20   surgery.  I think when she first saw him, she

21   had not had as many injections with Dr. Moise

22   and so she had done more full series, so she

23   should go back and see him to consider

24   surgery.  An option is to -- even if he

25   recommends it to say thank you, but no thank

130

1              Charles Alan Kaplan, M.D.

2     you, that would be her option.

3              Again, over some last months,

4     there was some exacerbation of the left

5     shoulder pain, but while it was doing better

6     after the bursa injections, I did recommend

7     that she go back and see Dr. Scilaris because

8     on the last visit or two, the left shoulder

9     was not doing as well as some months before

10    that.  There is a consideration that surgery

11    could be done to the left shoulder and I again

12    sent her to Dr. Lempert.

13              So she was doing -- on the one

14    hand, she was doing better, especially after

15    getting her knee surgeries.  I think that

16    helped her very nicely.  I mean, she, again,

17    as I stated, was a little reluctant for

18    evasive things in the beginning, but I think

19    I have in one of the notes she was very

20    pleased with the results of the left knee

21    surgery and that helped convince her, you

22    know, I'm going to do my right too because I

23    realized how much this helped me.

24              So she's doing better.  There's

25    still a little bit of a setback going on with

1              Charles Alan Kaplan, M.D.

2      the spine and the left shoulder that could

3      require further surgical attention.

4           Q.     I apologize if I asked you this.

5                  Do you know if Ms. Falero has

6      been on Social Security Disability since

7      around 2007, why she has not worked since 2002?

8           A.     I don't have the exact reason for

9      that.

10          Q.     What is your understanding, if

11     any?

12          A.     That it's related to the gestalt

13     of her prior pain conditions.  Could it be

14     from blood pressure, I don't know.  It's not

15     unusual.  There are people who go out on high

16     blood pressure, diabetes kind of things.  It's

17     rare.  So some aspect of these previous pain

18     conditions that she mentioned to me, you know,

19     and again, I don't have the paperwork she

20     filed with them, so I don't know.

21          Q.     Did you ever ask her?

22          A.     You know, I don't have anything

23     documented.  It's possible that in a brief

24     question or something I did and it may have

25     made sense, I didn't even put -- you're out

132

1          Charles Alan Kaplan, M.D.

2    for some aches and pains, yeah, okay, and

3    it made sense.  I didn't think it was

4    psychiatric.  She didn't tell me, oh, no, it's

5    for psychiatric or something.

6              So it's possible I had that

7    discussion with her.  It was quick.  It was

8    congruent to maybe what I was thinking and I

9    didn't note it, but I don't have it

10   documented.

11        Q.    I know what you mean by

12   "gestalt," but what do you mean by it?

13        A.    You put all of her conditions

14   together, the neck, the back, the

15   fibromyalgia, all -- everything that you're

16   allowed to file on a Social Security

17   Disability, you can.

18        Q.    Well, what is "fibromyalgia"?

19        A.    Well, fibromyalgia is a condition

20   where the person does have multiple aches

21   throughout their body.  It's not well-known on

22   the etiology, like it doesn't have to be a

23   structural cause, it doesn't have to be any

24   joint problem, just tender and a complaint of

25   pain with 15 parts of the body.  Usually,

1          Charles Alan Kaplan, M.D.

2    tests are negative.  The latest thinking is

3    due to some type of mitochondrial dysfunction,

4    the mitochondria of the cell, but they're not

5    sure.  No super great treatment for it, some

6    modifications.  But "myo" is for muscle and

7    "algia" is for pain.

8          Q.     Is it acute pain?  In other

9    words, how does it manifest itself?

10          A.     It manifests by multiple body

11   parts and it has to be some duration of time,

12   you know, meaning if I put anybody out of

13   shape, let's say, to work doing moving today,

14   18 hours of moving boxes, you and me, and we

15   ache all over, that's not fibromyalgia.  Even

16   though we're hurting all over, it's got a

17   medically explainable cause to it.  You did

18   all this extra work.  It's going to go away.

19               This is -- there is no

20   explainable cause for it, you know.  It

21   generally takes some time to develop.  It

22   starts in one area, two areas.  By the time

23   you're at the doctor and he's checking you,

24   got it in multiple areas, multiple areas of

25   tenderness, the tests are negative.  There's

134

1           Charles Alan Kaplan, M.D.

2  no test that shows fibromyalgia.

3      Q.    So how do you determine whether

4  it's fibromyalgia versus a psychosomatic

5  condition?

6      A.    The answer is this:  It's

7  somewhat interrelated.  People who have

8  fibromyalgia have a higher rate of depression

9  in the general population, whether it's cause

10  and effect or result.  You have pain in all

11  these parts for some period of time, people

12  get down, so they're often together.  They

13  don't have to be.  You can have depression or

14  something like that without aches and pains,

15  but, you know, psychosomatic is -- how do

16  I say this?  I guess, you know -- there are

17  levels to psychosomatic, so, you know, it's

18  for a psychiatrist to get involved in, if

19  that's what you want to prove the difference

20  for.  But there are associations with

21  depression with fibromyalgia.

22           Psychosomatic, it does imply

23  "psycho" causing the body, and that, you

24  know -- like ulcers have been -- before they

25  knew about the bacteria, right, it was always

1           Charles Alan Kaplan, M.D.

2    psychosomatic.  You're stressed out, you got

3    an ulcer in your stomach, "psycho" causing

4    "somatic."  There are healthy people with no

5    depression and they have fibromyalgia, so

6    it's not contingent, but there is a greater

7    association of depression with fibromyalgia.

8           Q.     There's a linkage --

9           A.     It's an association.

10          Q.     What is the difference, please,

11   between "bursitis" and "arthritis"?  They're

12   both "itis."  They're both inflammations.

13          A.     "Itis" means inflammation

14   anywhere, uveitis in the eye, gastritis in

15   the stomach.  So arthritis is of the joint

16   cartilage, so it's in the joint.

17               Bursitis, so tendons -- very

18   often the muscle comes, you know, at the end

19   of the tendon and the tendon is attaching to

20   the bone and it may be traveling over a

21   prominence or, let's say, a bump in the bone.

22   So the body has a bursa between the bone and

23   the tendon or even the ligament, which

24   normally is like two thin layers of a slightly

25   lubricated tissue that allows gliding of the

136

1              Charles Alan Kaplan, M.D.

2     tendon over the bump.  So if a tendon has to

3     go over this bump (indicating), the body might

4     have a little bursa there (indicating).  So

5     when you're moving your tendon (indicating),

6     this grease -- you know it's not grease,

7     right, but there's some lubrication there.

8              Due to injury, due to overuse,

9     you can start to produce so much inflammation,

10    the two layers separate, and there's fluid now

11    in that bursal sac.

12         Q.    Beneath the lining?

13         A.    In between the lining.  So, let's

14    say, there's a thin lining here (indicating),

15    right, and now the tendon is coming over

16    (indicating), because that lining is, you

17    know, blowing up like a balloon.  Now the

18    tendon is also being pushed up (indicating)

19    and starts working at a funny angle, a

20    nonmechanical angle (indicating).

21         Q.    Would you tell me, please, what

22    is meant by the medical term "sciatica" and

23    how does sciatica manifest itself?

24         A.    So, you know, sciatica, doctors

25    use that word.  It's generally also a layman's

137

1           Charles Alan Kaplan, M.D.

2    term.  It's pain down usually the back of the

3    leg.  It's felt to be, you know, inflammation

4    of the sciatic nerve.  The sciatic nerve

5    itself is really made of several branches.

6              The sciatic nerve begins in the

7    buttock.  So it's -- the sciatic nerve is not

8    actually coming from the spinal cord.  The

9    nerves from the spinal cord come out.  They

10   group together.  They form the sciatica.  So

11   usually what people have is the radiculopathy,

12   but they will say, oh, I have sciatica.

13   Radiculopathy is a big word for people to use,

14   maybe, I don't know.

15             There are a few people with true

16   sciatica, let's say, that that nerve is being

17   pinched in the buttock.  It could be from a

18   tumor or something like that.  They have no

19   back involvement.  They just have this

20   sciatica.  So I think that's -- yeah, that's

21   it.

22       Q.    Is there not some type of a test

23   where you press down upon the sciatic notch

24   and you can elicit a painful reaction from the

25   patient?

Charles Alan Kaplan, M.D.

1

2      A.      The answer is yes.  You know,

3   again -- there is that test, yes.

4      Q.      At Spine & Orthopedic Rehab

5   Center, is it the practice of the office when

6   a patient comes in for a physical therapy

7   session to have the patient sign a sign-in

8   sheet of any type?

9      A.      Yes.  There's a sign-in sheet.

10      Q.      Doctor, is that something that

11   has become required by insurance, to have a

12   sign-in sheet, or is it just good practice to

13   document that the patient was there?

14      A.      Well, I know it's good practice,

15   so we've always done it since I've been

16   working at this office.  Is it the law, I

17   don't know.  Does the insurance company deny

18   payment if you can't prove it, I don't know.

19   We have sign-ins.  Every patient signs in.

20   I'm not sure if it's put in the computer, so

21   I'm not sure where they keep it.

22      Q.      Now, you mentioned a short while

23   ago in passing that you're not in court a lot.

24              In this calendar year, 2017,

25   approximately how many times have you

1          Charles Alan Kaplan, M.D.

2     testified either here at a deposition or in a

3     trial setting?

4          A.     In a trial setting, zero.  In a

5     deposition like this, I don't think it was

6     2017.  I think I did something the end of

7     2016.

8          Q.     Dr. Kaplan, did you testify at

9     trial in 2016?

10         A.     I don't know.  I would say since

11    I've been with Dr. Kyriakides, which, again,

12    is middle 2008 to now, I've been to court four

13    times, maybe five times.

14         Q.     When you say "court," are you

15    talking about like a workers' compensation

16    setting or --

17         A.     No, over --

18         Q.     Over here at Kings County

19    Supreme?

20         A.     Yeah.

21              MR. KENDRIC:  Can you mark this,

22         please?

23              (Kaplan, M.D. Exhibit C,

24         Curriculum Vitae of Dr. Kaplan, marked

25         for identification.)

140

1     Charles Alan Kaplan, M.D.

2   Q.  Dr. Kaplan, take a look at this,

3 if you don't mind (handing).

4     Is that a current copy of your

5 curriculum vitae?

6   A.  Um...

7   Q.  Relatively current?

8   A.  I would say it is.  I generally

9 don't submit -- everything here is true.  Let

10 me just see (perusing).  So I'm not in all

11 these professional societies anymore.

12   Q.  Which ones are you in and which

13 ones are you not?

14   A.  I'm only in the American Academy

15 of Physical Medicine & Rehabilitation right

16 now.

17   Q.  Were you in these other

18 organizations but you let it lapse for one

19 reason or the other?

20   A.  Correct.

21   Q.  Okay.

22   A.  And so private practice -- so

23 I had my own practice from 1992 to the end of

24 2005.  Then I actually moved to Israel for two

25 and a half years.  And then when I came back,

141

1           Charles Alan Kaplan, M.D.
2    I worked for Dr. Kyriakides, so -- I knew him
3    for years.  We did training together, so I
4    don't know if I even submitted this to him,
5    hey, I need a job, because that's not how it
6    happened.  So this is something I probably had
7    in my computer and it's still there.  And
8    everything is accurate.
9              Board certification is updated,
10   I'm good through 2024.  License is good.  I'm
11   no longer a clinical instructor at NYU.  When
12   I moved to Israel, I gave that up because I
13   didn't know I was coming back.  So yeah,
14   that's fairly up to date.
15        Q.    What does this say, "ABEM board
16   certification" (indicating)?
17        A.    Oh, American Board of
18   Electrodiagnostic Medicine.  So, again, I did
19   get certified in that, which was valid for
20   10 years, EMGs.  And then, again, when I moved
21   to Israel, I thought I was moving for good.
22   I'm not going to redo the test on that.  I'm
23   not a neurologist.  I don't need it.
24        Q.    I understand, but you have
25   allowed that one to lapse?

142

1                    Charles Alan Kaplan, M.D.

2          A.       Correct.

3          Q.       But your physical medicine and

4  rehabilitation board credentials are current?

5          A.       Current and up to date through

6  2024.

7          Q.       Being that your medical practice

8  is here in New York and being that Ms. Falero

9  lives in Brooklyn, why was it that she

10  received ambulatory procedures in New Jersey,

11  in Englewood?  Why is that?

12         A.       The decisions to do them were by

13  Dr. Moise and Dr. Scilaris.  That's where they

14  do them.

15         Q.       But Dr. Scilaris is licensed to

16  practice here in New York, isn't he?

17         A.       He's licensed in both.

18         Q.       I saw him on the letterhead of

19  the different facilities.

20                   The decision was done to bring

21  her over to another state to do these

22  in-office procedures, can you explain that for

23  me?

24         A.       I can only say what I stated.

25  I can't explain that to you.  That's their

143

1                    Charles Alan Kaplan, M.D.

2       decision.  Dr. Moise is his own separate

3       corporation.  That's how he does things.

4       I can't comment on that.

5            Q.     Is Health East still treating

6       patients?

7            A.     As far as I know, yeah.

8            Q.     Because we spoke about the fact

9       that Dr. Scilaris opened up that South Dean

10      Street Orthopaedics.

11                  Is he still with Health East?

12           A.     You're asking me questions that

13      I truthfully don't know the answers to.  I

14      mean, I believe that Health East is also on

15      Dean Street.  I don't know if it's the same

16      building, a side entrance.  I don't know his,

17      you know --

18           Q.     Right, that's precisely why I

19      asked the question.  I see that Scilaris now

20      is operating under the name South Dean, and

21      that's what causes me to ask the question.

22                  Is Health East still operating?

23           A.     The answer is I'm under the

24      assumption yes, but this is like a corporate

25      question.  I'm not involved with it.  I don't

144

1                    Charles Alan Kaplan, M.D.

2      know.  From, again, I think two years, three

3      years, there was some talk of maybe having it

4      being a multidisciplinary group where Scilaris

5      and Dr. Kyriakides were one corporate entity

6      and I think that's where they were going, and

7      then I heard it fell through.  But I really

8      don't ask a lot of questions there.  I'm not

9      privileged.  It's -- I don't want to know

10     anybody's business about, you know -- that's

11     not me.  I work there, and that's it.

12          Q.    So the fee charged today was

13     $6,000, and my question to you is, if called

14     to testify at trial in this matter, will your

15     fee also be $6,000 or is it a different fee

16     structure based upon the fact that you might

17     be testifying for half a day versus a full day

18     in court testimony versus out of court

19     testimony?

20          A.    The answer is this:  I don't have

21     a full answer for you.  I'm sure there will be

22     some fee.  All these things are arranged by

23     Maria, who handles it, tells me where to go,

24     and she sets the price.  You know, she's never

25     asked me what I wanted to charge.  It's always

1              Charles Alan Kaplan, M.D.

2  been she told me, this is the fee.  It's never

3  happened in, again, my four, five times --

4  because I think one was, okay, go for half a

5  day, and it got around lunchtime and they

6  didn't cancel my afternoon patients, but it

7  ended, so I don't know how she really does it.

8              But there would be a fee.  And

9  there probably is -- if you promise it will be

10  a half a day, it probably could be a half day

11  for you.  But, you know, that's not a tactic,

12  Dr. Kaplan, say what I want or you don't get

13  lunch today, you know.  So that's between --

14  I never asked her what to charge.  She's

15  always told me what it is.

16              MR. KENDRIC:  Okay.  Thank you.

17              MR. FAYYAZ:  I just have two

18      follow-up questions.

19  EXAMINATION BY

20  MR. FAYYAZ:

21      Q.    Dr. Kaplan, at the time of the

22  initial evaluation on May 12, 2015, did

23  Ms. Falero ever tell you if she had any

24  headaches prior to this accident of May 4,

25  2015?

1          Charles Alan Kaplan, M.D.

2      A.      I don't have anything documented

3  about her telling me that.

4      Q.      In arriving at your opinion as to

5  causation of the claimed right knee and the

6  left knee injury arising out of this accident,

7  did you also take into consideration the

8  surgeries that she underwent for the right

9  knee and the left knee after this accident?

10     A.      Did I take into consideration the

11 fact that she had surgery?

12     Q.      Yes.

13     A.      I was thinking about that when

14 you asked, but I'm going to say no with this

15 explanation:  Let's say there was something

16 completely unusual, like we did an MRI and

17 there was a bone tumor, and I said,

18 Dr. Scilaris, I want to do bone tumor surgery

19 under this case.  For that, I'm sure

20 Dr. Scilaris would say, no, you've got to

21 see a specialist on bone tumors.  It's not

22 accident-related.

23          So my opinion was that it was

24 causally related, and Dr. Scilaris' actions,

25 we'll say, were congruent to that.  He didn't

```
 1                Charles Alan Kaplan, M.D.
 2    have past notes.  He only had what I had.
 3    So his -- doing the surgery is congruent with
 4    my opinion.  That's why I referred her to him,
 5    because I thought they were causally related.
 6    I'm treating for the accident.  I'm not
 7    treating anything before the accident, and
 8    that he felt it was surgically appropriate to
 9    do the surgery through this accident, and
10    fortunately, she had good results.
11                So it doesn't change my opinion.
12    It's congruent with my opinion and there was
13    nothing -- what's the word?  Zebra.  There was
14    no zebra finding of the tumor or something
15    like that which he would oppose.  So there's
16    nothing about her having the surgery that
17    changed my opinion.
18                MR. FAYYAZ:  That's it.
19                MR. KENDRIC:  Thank you.
20                MR. FAYYAZ:  Thank you.
21                (Time noted:  2:00 p.m.)
22
23
24
25
```

148

```
 1              Charles Alan Kaplan, M.D.
 2            A C K N O W L E D G M E N T
 3
 4    STATE OF NEW YORK     )
                             :ss
 5    COUNTY OF             )
 6
 7
 8            I, CHARLES ALAN KAPLAN, M.D.,
 9    hereby certify that I have read the transcript
10    of my testimony taken under oath in my
11    deposition of August 25, 2017; that the
12    transcript is a true, complete and correct
13    record of my testimony, and that the answers
14    on the record as given by me are true and
15    correct.
16
17                    _____
18                    CHARLES ALAN KAPLAN, M.D.
19
20    Signed and subscribed to before
21    me, this_____ day
22    of _____, 2017.
23
      _____
24    Notary Public, State of New York
25
```

149

1

2    ------------------I N D E X--------------------

3    WITNESS                  EXAMINATION BY        PAGE

4    C. KAPLAN, M.D.      MR. KENDRIC               4

5                         MR. FAYYAZ              145

6

7    ------------------EXHIBITS------------------

8    KAPLAN, M.D.                         FOR I.D.

9        A      One-page handwritten notes

10              created by Dr. Kaplan          17

11       B      Two-page document entitled

12              Follow-up Report dated

13              August 2, 2017                 52

14       C      Curriculum Vitae of

15              Dr. Kaplan                    139

16

17

18

19

20

21

22

23

24

25

150

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                          ) ss.:

5    COUNTY OF NASSAU       )

6

7              I, CHRISTINE DEROSA, a Notary

8         Public within and for the State of New

9         York, do hereby certify:

10             That CHARLES ALAN KAPLAN, M.D.,

11        the witness whose deposition is

12        hereinbefore set forth, was duly sworn

13        by me and that such deposition is a true

14        record of the testimony given by such

15        witness.

16             I further certify that I am not

17        related to any of the parties to this

18        action by blood or marriage; and that I am

19        in no way interested in the outcome of

20        this matter.

21             IN WITNESS WHEREOF, I have

22        hereunto set my hand this 14th day of

23        September, 2017.

24                          CHRISTINE DEROSA

25